[Crim. No. 44912. Second Dist., Div. Four. Mar. 13, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ROOSEVELT ALLEN, JR., et al., Defendants and Appellants.

618

**620**

COUNSEL

Thomas Kallay and Dennis L. Cava, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, John R. Gorey and Gary R. Hahn, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KINGSLEY, J.—In a joint jury trial, the defendants were found guilty of the first degree murder of Gregory Ainsworth (count I), the attempted murder of Gregory's wife, Cheryl (count II), and the attempted murder of the Ainsworth's cousin, Taggra Barron (count III). (Pen. Code, §§ 187, 664.)

The jury further found that both defendants personally used firearms in counts I and II, that both inflicted great bodily injury on Cheryl, and that defendant Allen used a firearm in count III. (Pen. Code, §§ 12022.5, 12022.7.)

The evidence established, and the defendants conceded, that two persons who were known to Gregory Ainsworth entered the Ainsworth home on November 2, 1981, for the sole purpose of killing Gregory and eliminating any witnesses to that killing. That the perpetrators' intent was execution-style murder was undisputed. The only dispute was who those perpetrators were. No motive was shown on the part of either defendant, and defendant Brewer presented evidence of an alibi. Nor did any physical evidence connect either defendant with the crimes. However, both Cheryl and Taggra identified the defendants as the perpetrators, describing their degree of certainty in such terms as "no doubt," "100% sure," and "positive." The adequacy of these identifications is the major issue on appeal.

The defendants were acquainted with the Ainsworths, as friends of Gregory, a cocaine dealer. Defendant Allen came to the house briefly on the evening of November 1 in search of Gregory, who was not at home. Early the next morning, Cheryl, who had been asleep in the bedroom, heard a knock on the door. She woke Gregory when the person who had knocked identified himself as "Leroy." Cheryl recognized "Leroy's" voice as that of defendant Brewer, who, among other acquaintances of the Ainsworths, uses the nickname Leroy.

Gregory looked out of the window, then opened the door. Taggra, who was sleeping on the front room couch, saw two men go into the kitchen with Gregory. Then, in rapid sequence, Gregory was heard to say, "What's happening, man?" in a normal voice, followed by the sound of one or two gunshots.

Next, Taggra saw Allen enter the bedroom. Cheryl testified that Allen entered and fired once at her while she was lying in bed; the bullet entered the back of her neck. Although the room was relatively dark and Cheryl did not see Allen's face, she recognized him by his black clothing and silhouette. Allen left the bedroom and Cheryl went over to the closet to try to hide. However, Brewer then appeared before her, with his face recognizable although distorted by a stocking mask, and shot her several times in the front of her body. At this point, Taggra heard a noise like firecrackers going off, then saw Brewer come out of the bedroom area, followed by Allen. Taggra saw no stocking mask on Brewer.

Cheryl heard Allen say, "Don't mess with the kids." (The Ainsworths' three infant children were in the house.) Taggra, who was hiding behind

the couch, heard Brewer say, "Get her." She then saw Allen fire a shot at her, which missed, after which the defendants left the house. Taggra's identification of Allen was based upon seeing his face as he aimed at her; earlier, she had noticed only the two intruders' difference in height, hairstyle, and clothing color.

In the aftermath, Gregory was found dead in the kitchen with mortal gunshot wounds to the head and chest. Cheryl was taken to the hospital for surgery. At first both Cheryl and Taggra—who was verging on hysteria— told police they did not know who or how many people had shot at them. (At trial, Cheryl had no memory of these conversations.) At around 3 in the morning, however, Taggra, who had by then calmed down, named Allen as one of the two intruders. At 5:30, Cheryl named Allen as one and gave the description of a man she called "Leroy" as the other.

Allen was then arrested, and Cheryl told of the arrest. Subsequently, Cheryl indicated uncertainty as to who had shot her. She asked whether Allen was involved, indicating she had "heard" that he was, but that she had not seen him or heard his voice at the scene.

Both Cheryl and Taggra picked out Brewer's picture from a photographic lineup and, in a live lineup, identified both defendants as the intruders. On the back of Brewer's picture, Taggra wrote, "I think [he] is the one"; at trial, she testified that she selected Brewer's picture because "he appeared to look like the guy that was in the house." Unlike Cheryl, Taggra had never seen Brewer before the shooting.

I

 Both defendants challenge the eyewitness identifications of them as the perpetrators (although Allen concedes the adequacy of Taggra's identification of him in count III). According to defendants, Cheryl's testimony is suspect because: she was initially unable to say who had shot her and later disclaimed personal knowledge; her identification of Allen was based only on his silhouette and dark clothing, all in a darkened room; the location of her neck wound shows that she could not have been facing Allen when she assertedly saw him; she was in a poor position to be able to recognize Brewer in the closet; and her identification of Brewer's voice was unreliable absent evidence that his voice was unusual or that he had ever spoken directly to her before. According to Brewer, moreover, Taggra's testimony identifying him is suspect because: she had only a brief glimpse in the dark; she testified in a prior proceeding that it was Allen, rather than Brewer, who said, "Get her"; her identification of Brewer's picture was less than positive and was tainted by her prior viewing of his photograph in isolation;

and she had previously testified that three men, rather than two, came out of the kitchen.

The defendants also point out that Cheryl's and Taggra's descriptions of them as they appeared at the crime scene differed as to hairstyles and as to whether or not Brewer was wearing a stocking mask. These discrepancies, uncertainties and weaknesses assertedly add up to rendering the identification less than "reasonable in nature, credible, and of solid value," and we are therefore urged by defendants to reverse the convictions on grounds of insufficient evidence. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

■ It is well settled that, absent physical impossibility or inherent improbability, the testimony of a single eyewitness is sufficient to support a criminal conviction. (*People* v. *Turner* (1983) 145 Cal.App.3d 658, 671 [193 Cal.Rptr. 614].) ■ " 'To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]' " (*People* v. *Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267], quoting *People* v. *Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758]; see also, *People* v. *Ontiveros* (1975) 46 Cal.App.3d 110, 117 [120 Cal.Rptr. 28].) Further, a jury is entitled to reject some portions of a witness' testimony while accepting others. (*People* v. *Nunez* (1983) 144 Cal.App.3d 697 [192 Cal.Rptr. 788].) Weaknesses and inconsistencies in eyewitness testimony are matters solely for the jury to evaluate. *People* v. *Fagalilo* (1981) 123 Cal.App.3d 524, 530-531 [176 Cal.Rptr. 698], held that a witness' prior identification of someone other than defendant as her assailant did not render insubstantial her ultimate identification of defendant. ■ Here, the jurors could reasonably have suspected that the conditions at the crime-scene were too poor to permit identification, that Cheryl and Taggra named Allen only because of his earlier visit to the house, and that they named Brewer only because he, like one of the perpetrators, used the name "Leroy." This scenario would explain why their identifications wavered and why their descriptions were somewhat inconsistent. The jurors, however, did not take this view; they accepted the accuracy of Cheryl's and Taggra's ultimate identifications. The question on appeal, therefore, is whether these identifications were inherently improbable or factually impossible under the circumstances shown. (*People* v. *Turner, supra,* 145 Cal.App.3d 658; *People* v. *Thornton, supra,* 11 Cal.3d 738.)

Clearly, they were not. Although the front room and bedroom were dark, some light penetrated from the kitchen and the street. It is not improbable, under these circumstances, that one would be able to recognize an acquaintance (as Allen was to Cheryl) by the silhouetted shape of his body. Nor is it inherently improbable that once one's eyes adjusted to the relative darkness, facial identification could be made. Cheryl's identification of Allen as her initial assailant, moreover, was corroborated by Taggra's testimony that he was the first intruder to enter the bedroom[1] and by Taggra's agreement with Cheryl that he wore dark clothes. (Contrary to Allen's contention, not all clothes necessarily appeared dark in the darkened rooms, since Taggra testified that Brewer had on a tan-colored jacket.) In light of Taggra's testimony, it is immaterial that Cheryl may have been in a poor position to see Allen when he shot at her.

Nor was Cheryl's voice-recognition of Brewer inherently improbable. She had heard Brewer speaking to other people in her presence several times in the past. Human voices are not so fungible that an acquaintance's voice is inherently unrecognizable absent it possessing some unusual distinction. Moreover, in order to attach the voice she heard to Brewer, Cheryl had only to distinguish it from among the handful of other people she knew as "Leroy."

We are not persuaded, either, that the discrepancies as to hairstyles and the stocking mask rendered the identifications insubstantial. The viewing conditions were admittedly poor for picking out detail, and at the time Cheryl saw Brewer at the closet door the nightmare quality of her ordeal combined with her wound might well have distorted her perception of his face; she could have rationalized such a distortion by mentally inventing a stocking mask. At any rate, Cheryl's identification of Brewer as one of the two men who shot her, which was corroborated by Taggra's degree of certainty in selecting Brewer's picture, was a question solely for the jury.[2] (See *People* v. *Ford* (1981) 30 Cal.3d 209 [178 Cal.Rptr. 196, 635 P.2d 1176].)

We further do not agree that Cheryl's vacillations "completely discredited" her ultimate identifications. Both Cheryl's and Taggra's initial failure to name their assailants could have been due to confusion, pain, hysteria and/or fear of retaliation. In the immediate aftermath of the shootings, neither witness was in the best mental condition to give information, and Cheryl never did recover from her loss of memory of this time-period. In light

---

[1]As noted above, Allen (if not Brewer) does not dispute that there was substantial evidence of his presence in the house during the crimes.

[2]The record belies Brewer's contention that the police initially showed Taggra his photograph in isolation. When asked whether she had been shown "a single photograph," i.e., "showing just one person," she answered, "No."

of this episode of partial amnesia, we cannot say as a matter of law that Cheryl's later uncertainty was not the product of a temporary mental fogginess that cleared up by the time of trial.

Finally, the differences between Taggra's preliminary hearing and trial testimony were the type of inconsistencies which jurors are free to resolve according to their best judgment. *People* v. *Fagalilo, supra,* 123 Cal.App.3d 524, is dispositive on this point.

We do not say that the problems pointed out by the defendants presented insubstantial questions for the jury. The opposite is true. However, where as here and in, e.g., *Fagalilo,* positive identifications are made at trial and there is evidence that the witnesses were able to perceive what they purport to have perceived, the reviewing court has no ultimate resolution. In the end, that resolution is dependent upon the credibility of the eyewitnesses, a determination only a jury can make. The eyewitnesses' testimony in this case therefore constituted sufficient evidence of the defendants' identity as the perpetrators.

## II

■ Allen contends, however, that even conceding his presence in the apartment as testified to by Taggra, there was insufficient evidence that he was guilty of the murder charged in count I. There were no witnesses to Gregory's murder in the kitchen. Consequently, it is urged that although Allen *might* have shot Gregory or aided and abetted the shooter, it is equally probable that he was merely present at the scene. ■ Mere presence at the scene of a crime, of course, even if combined with knowledge that the crime is being committed, does not amount to aiding and abetting. (*People* v. *Weber* (1948) 84 Cal.App.2d 126, 130 [190 P.2d 46].)

We treated a somewhat similar case in *People* v. *Marcus* (1974) 36 Cal.App.3d 676 [111 Cal.Rptr. 772]. There, although there were no witnesses to a robbery-murder, both defendants were seen together near the crime-scene directly before and immediately after the crime. In addition, two men who could have been the defendants were seen running away from the scene. Both defendants later used a credit card taken in the robbery under circumstances showing knowledge that it was possessed illegally. Recognizing that the state can rely entirely on circumstantial evidence to connect a defendant with the commission of a crime (see, e.g., *People* v. *Griffin* (1971) 15 Cal.App.3d 442, 446 [93 Cal.Rptr. 319]), we held that the foregoing evidence was sufficient to prove the defendants' guilt of murder.

■ Here, the evidence is far more incriminating. Direct testimony placed both Allen and Brewer in the kitchen when Gregory was shot there.

The fact that he was shot immediately after addressing the defendants in a friendly manner strongly suggests that whichever defendant killed him had a preconceived intent to do so. The immediate aftermath, in which *both* defendants—without further ado—attacked Cheryl and shared in the intent to shoot at Taggra, strongly suggests a prior agreement to kill Gregory and all witnesses. Indeed, in their arguments to the jury, both defendants acknowledged that the evidence showed a preconceived "assassination" plot. Under these circumstances, it is immaterial that the evidence was silent as to which defendant actually shot Gregory; it is virtually inconceivable that the one who did *not* shoot him did not aid and abet the shooting, i.e., by gaining entrance under the guise of friendship with intent to facilitate the murder.

■ Allen's argument does make sense, however, with respect to the jury's findings that he personally used a weapon in count I within the meaning of Penal Code section 12022.5. Since two .32 caliber cartridges were found on the kitchen floor, the evidence suggested that both of Gregory's wounds were inflicted by the same gun. Whether that gun was used by Allen, as opposed to Brewer, is purely a matter of conjecture. The state had the burden of establishing Allen's *personal* use beyond a reasonable doubt. (*People* v. *Federico* (1981) 127 Cal.App.3d 20, 31 [179 Cal.Rptr. 315].) Since the evidence of what happened in the kitchen proved at most a 50 percent probability that he was the user, the state's burden was not met: "We . . . have a case belonging to that class of cases where proven facts given equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other. . . ." (*Pennsylvania R. Co.* v. *Chamberlain* (1933) 288 U.S. 333, 339 [77 L.Ed. 819, 823, 53 S.Ct. 391].)

The issue is slightly different with respect to Brewer. We note that a bullet thought to be of a different caliber was found somewhere in the bedroom and that, since Cheryl testified that only Allen fired a shot in the bedroom as opposed to Brewer's shooting into the bedroom *closet,* it might be inferred that Allen possessed a gun other than the count I murder weapon. In a civil case, perhaps this additional evidence would substantially prove that Brewer was the weapon-user in count I, on the theory that Allen and Brewer each possessed a single weapon, that the bullet found in the bedroom did not ricochet out of the closet, and then reasoning by process of elimination. The burden in a criminal case, however, is proof sufficient to convince a rational trier beyond a reasonable doubt. Given the premise here—accepted by all parties—that the crimes were the product of an assassination-type murder plot involving the elimination of multiple witnesses, it cannot be lightly presumed that each participant in such plot equipped himself with a

single gun. The contrary is too often true, and in the case before us, where the targeted victim was a cocaine dealer who frequently entertained nighttime visitors, there are additional problems in automatically presuming that the men who sought to kill him were so confident of easy success that they dispensed with any backup weapons. We conclude that the slight circumstantial evidence that Brewer was the weapon-user in count I is of insufficiently solid value to support the use finding as to him.

The evidence, however, clearly established that both defendants—granted that they were the perpetrators—were participants in a murder in which a principal was armed with a firearm. (Pen. Code, § 12022, subd. (a).) Every gun use within the meaning of section 12022.5 necessarily includes a violation of section 12022, subd. (a). (*People* v. *Turner* (1983) 145 Cal.App.3d 658, 684 [193 Cal.Rptr. 614].) ■ Where a reviewing court finds insufficient evidence that a defendant committed the crime of which he was convicted but finds overwhelming evidence that he committed a lesser included offense, the court is empowered to reduce the conviction to the lesser offense. (*People* v. *Steger* (1976) 16 Cal.3d 539 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]; *People* v. *Enriquez* (1967) 65 Cal.2d 746 [56 Cal.Rptr. 334, 423 P.2d 262]; see also, Pen. Code, § 1260.) ■ Although the weapon enhancement provisions here are not strictly "crimes" or "offenses," we see no reason why the same rationale should not apply to them. Accordingly, rather than strike the gun-use findings altogether, we exercise our discretion to reduce them to the lesser included violations of Penal Code section 12022, subdivision (a). The matter is therefore remanded to the trial court for resentencing on the lesser enhancement as to both defendants.

### III

The information charged that each defendant, with the specific intent to inflict great bodily injury on Cheryl, personally inflicted such injury. The jury was accurately instructed that to sustain these allegations it was necessary to find both specific intent and actual infliction of injury. These two elements were recited on the count II verdict form for Allen. However, in an apparent clerical error, the verdict form for Brewer recited only that he intended to inflict injury and omitted to recite that he actually inflicted it. ■ Brewer now contends that we must reverse the injury finding because, in light of the verdict form, no finding was made that he actually inflicted injury in count II.

We note that once the jury determined that Brewer was one of the perpetrators, there was no question that he personally inflicted great bodily injury on Cheryl. Cheryl testified that she was first shot in the neck by one

of the perpetrators, and then in the body by the other. Brewer has never contended, here or below, that Cheryl was not shot by *both* perpetrators. Under these circumstances, and in view of the accurate jury instructions on all of the elements necessary to sustain the injury allegation, the omission on the verdict form would seem to be an insignificant technicality.

As respondent points out, *People* v. *Radil* (1977) 76 Cal.App.3d 702 [142 Cal.Rptr. 233] represents the converse of the situation here. In *Radil,* the verdict form on the injury allegation recited actual infliction of injury but omitted a finding of intent. As here, the jury was properly instructed on both elements, and substantial evidence established the element omitted on the verdict form. The court stated: "It is clear that the jury was fully instructed and understood that a specific intent was required to uphold the allegation in question. Therefore, the fact that the form of the verdict did not specifically state that the jury was making such a finding was not prejudicial to appellant. [Citation.] A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court. It must be upheld when, if so construed, it expresses with reasonable certainty a finding supported by the evidence." (*Id.,* at p. 710.)

We find it inconceivable that the jury here did not mean to find that Brewer committed, as well as intended, great bodily injury. Therefore, under *Radil, supra,* the judgment on the injury allegation must stand.

## IV

■ The defendants also allege that they are entitled to reversal of their first degree murder convictions as the jury was erroneously instructed on the liability of a defendant for aiding and abetting a crime. At trial, the court read to the jury CALJIC No. 3.01 on an accomplice's liability for aiding and abetting. This instruction was subsequently struck down as inadequate by the California Supreme Court in *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318] as it does not require that the defendant *intentionally* aid and abet the crime. The instruction as given would have permitted conviction in those rare instances where a defendant had knowledge of the principal's criminal intent, but unintentionally aided and abetted in the commission of the offense.

The defendants urge us to find that this error requires reversal per se, claiming that it creates "a presumption of intent which violates due process and requires automatic reversal of the conviction pursuant to *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450]." (*People* v. *Beeman, supra,* 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318].)

However, even if we were to adopt this standard, the error in the instant case does not require reversal. As the Supreme Court stated in *Connecticut v. Johnson* (1983) 460 U.S. 73, 87 [74 L.Ed.2d 823, 834, 103 S.Ct. 969]: "There may be rare situations in which the reviewing court can be confident that a *Sandstrom* error did not play any role in the jury's verdict. . . . [A] *Sandstrom* error may be harmless if the defendant conceded the issue of intent. [Citation.] In presenting a defense such as alibi, insanity, or self-defense, a defendant may in some cases admit that the act alleged by the prosecution was intentional, thereby sufficiently reducing the likelihood that the jury applied the erroneous instruction as to permit the appellate court to consider the error harmless." This exception was explicitly recognized by our own Supreme Court in *People* v. *Garcia* (1984) 36 Cal.3d 539, 554 [205 Cal.Rptr. 265, 684 P.2d 826]. It is clearly applicable here.

The facts surrounding the murder are uncontested. Eyewitness testimony indicated that two armed men entered the Ainsworth home and—with hardly a moment's hesitation and without warning—opened fire on Gregory Ainsworth, thereby killing him. The assailants then attempted to systematically murder all of the other witnesses in the house. At trial, the defendant's entire case consisted of contesting the eyewitness identification of the defendants as the men responsible. The defense made no argument that the defendants lacked the specific intent to kill, even though both men were charged with first degree murder and this was a necessary element of the offense. To the contrary, the defense insisted that the perpetrators must have had the specific intent to kill. In his summation to the jury, counsel for defendant Brewer stated, "The two men that came there to Greg Ainsworth's house came there with the specific intent to kill, to assassinate him, and they came with the intent to get rid of any possible witnesses." This statement was ratified by counsel for defendant Allen, "[T]his was not your random run of the mill murder. You know, this was a murder for a purpose. This was an execution hit. Absolutely! If you think back, people do not walk into other people's homes that you know in the middle of the night and shoot you in the head and in the heart without meaning to do it. . . ." Rather than contesting the specific intent of the perpetrators, the defense counsel wholeheartedly embraced it, hoping to persuade the jury that the defendants—who were friends of Gregory Ainsworth—could not possibly have been the ones who committed such a villainous crime. As the defendants agreed that the perpetrators had intentionally committed the murders, this issue was removed entirely from the jury's consideration. We conclude, therefore, that under no circumstances could the error complained of have played any role in the jury's verdict. As recognized by *Connecticut v. Johnson, supra,* the defendants have admitted that the crimes were intentional. Accordingly, the defendants' convictions for first degree murder must stand.

## V

Originally, the trial court imposed consecutive sentences on the three counts, designating the life sentence on count I (the murder count), to run before the determinate sentences on counts II and III. The Department of Corrections advised the court that this sentence violated section 669 of the Penal Code, which requires that a life sentence be served after a determinate sentence for another offense. Accordingly, the trial court, on June 29, 1984, resentenced the defendants, making the sentence on count II the base term, the sentence on count III, the subordinate term, and the life sentence on count I to run consecutive to the two determinate sentences. By a supplemental notice of appeal, defendants attack that action.

As the judgment must be remanded for a second resentencing in conformity with section II of this opinion, we need not, and do not, consider the contention that, since defendants had begun to serve the terms originally imposed, the trial court had no jurisdiction to resentence at all. The resentencing which we here direct unquestionably gives the trial court jurisdiction to impose an entirely new set of sentences.

However, we do here address the sentencing issues that of necessity will arise on the resentencing.

■ (a) The defendants contend that the trial court cannot use the ground of great bodily injury to enhance their convictions for the attempted murder of Cheryl Ainsworth (count II). The trial court made such an enhancement pursuant to Penal Code section 12022.7. This section provides that: "Any person who, with the intent to inflict such injury, personally inflicts great bodily injury on any person . . . shall . . . be punished by an additional term of three years. . . . [¶] This section shall not apply to murder or manslaughter or a violation of section 451 or 452. The additional term provided in this section shall not be imposed unless the fact of great bodily injury is charged in the accusatory pleading and admitted or found to be true by the trier of fact." The defendants contend that a violation of this precise section must be specifically alleged in the information before it can be used for enhancement and that the section is not applicable to the crime of attempted murder.

The defendants are in error. Section 12022.7 only requires the information to contain an allegation of great bodily injury. There is no requirement in section 12022.7 that the information specifically allege a violation of that section itself. Moreover, while omitting to allege a violation of section 12022.7, the information did allege that the defendants had inflicted great bodily injury and that they had done so "within the meaning of Penal Code

section 1203.075." Section 1203.075, subdivision (b)(3) specifies that "as used in subdivision (a), 'great bodily injury' means 'great bodily injury' as defined in Section 12022.7." Thus, an allegation that the defendants had inflicted great bodily injury for the purpose of section 1203.075 alleges the same facts necessary for a violation of section 12022.7.

We addressed a similar question in *People* v. *Barela* (1983) 145 Cal.App.3d 152, 161, footnote 5 [193 Cal.Rptr. 257]. There, the information alleged that the defendants personally used a firearm within the meaning of Penal Code section 12022.5. The information did not, however, allege a violation of section 1203.06—the companion section for use of firearms to section 1203.075, alleged here. In deciding that case we ruled that the allegation of the one section "imparts sufficient knowledge to respondent that use of a firearm is at issue." (*People* v. *Barela, supra,* 145 Cal.App.3d at p. 161, fn. 5.) We reach the same conclusion here. In alleging that the defendants inflicted great bodily injury within the meaning of Penal Code section 1203.075, the information gave defendants sufficient notice that great bodily injury was at issue. The trial court was therefore not in error in enhancing defendants' convictions under section 12022.7.

Furthermore, the defendants are in error in asserting that attempted murder may not be enhanced under Penal Code section 12022.7. The law is quite clear that while section 12022.7 prohibits enhancement for murder, attempted murder is a separate crime not covered by the statute and may be enhanced. (*People* v. *Wells* (1983) 149 Cal.App.3d 497, 505 [195 Cal.Rptr. 608]; *People* v. *Young* (1981) 120 Cal.App.3d 683, 694-695 [175 Cal.Rptr. 1]; *People* v. *Gray* (1979) 91 Cal.App.3d 545, 550-551 [154 Cal.Rptr. 555].) We therefore reject defendants' argument that enhancement by Penal Code section 12022.7 of their attempted murder convictions is improper.

■ (b) Defendants additionally contend that any increase of their sentences on remand constitutes double jeopardy. We disagree. Both the United States Supreme Court and our own Supreme Court have specifically rejected this argument. Most recently, the United States Supreme Court in *United States* v. *DiFrancesco* (1980) 449 U.S. 117, 135 [66 L.Ed.2d 328, 344, 101 S.Ct. 426], reaffirmed the holding of *North Carolina* v. *Pearce* (1969) 395 U.S. 711 [23 L.Ed.2d 656, 89 S.Ct. 2072] that the rule "permitting an increase of sentence on retrial is a 'well established part of our constitutional jurisprudence.' [Citation.]" "This Court's decisions in the sentencing area clearly establish that a sentence does not have the qualities of constitutional finality that attend an acquittal." (*United States* v. *DiFrancesco, supra,* 449 U.S. 117, 134 [66 L.Ed.2d 328, 344].) " 'The Constitution does not require that sentencing should be a game in which a wrong move by the judge means immunity for the prisoner.' " (*Bozza* v. *United States* (1947) 330 U.S. 160

[91 L.Ed. 818, 67 S.Ct. 645].) Similarly, our own Supreme Court has held that where the trial court has made an error in sentencing, "Such a sentence is subject to being set aside judicially and is no bar to the imposition of a proper judgment thereafter, even though it is more severe than the original unauthorized pronouncement." (*People* v. *Serrato* (1973) 9 Cal.3d 753, 764 [109 Cal.Rptr. 65, 512 P.2d 289], fn. omitted.)

Consequently, we find no violation of double jeopardy here.

The convictions are modified as above directed and, as so modified, are affirmed. The sentences are vacated and the case is remanded to the trial court for resentencing in accord with the views above expressed.

Woods, P. J., and Arguelles, J., concurred.

A petition for a rehearing was denied December 9, 1985, and appellants' petitions for review by the Supreme Court were denied May 16, 1985.