[No. B067093. Second Dist., Div. Four. July 21, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL BERRY, Defendant and Appellant.

**COUNSEL**

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Robert F. Katz and Scott Wm. Davenport, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WOODS (A. M.), P. J.**—Michael Berry appeals from the judgment entered upon his conviction by jury of first degree murder, two counts of attempted murder, and one count each of second degree robbery and first degree burglary, with findings the murder was committed with personal use of a firearm and during the commission of the robbery and burglary. (Pen. Code, §§ 187, 664/187, 211, 459, 12022.5, 190.2, subd. (a)(17).) He contends:

"The trial court erred in imposing the firearm use enhancement (Pen. Code, § 12022.5) in the commission of the homicide because appellant did not use a firearm as prescribed [*sic*]; furthermore, the term imposed exceeds that authorized at the time of the offense."

Viewed in accordance with the usual rules on appeal (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110]), the evidence established that at approximately 8 p.m. on May 10, 1989, Jesse Morrison and Nathan L. came to the Wilmington residence of the Cardenas family and asked for Cesar Cardenas, stating they wanted him to run a printing job for them. Lourdes Cardenas, Cesar's sister, told them he would be home later. About an hour later, Morrison and Nathan L. returned to the residence with appellant and his brother Shawn. Lourdes knew appellant and Shawn from the neighborhood where her family used to live. Cesar and the four visitors went into the garage, from which Cesar ran his business, to discuss the printing job. After the men returned to the house and ordered pizza, the four visitors left.

About midnight, Lourdes was awakened by Cesar, who was calling her name. She walked out of her room to find Morrison, Nathan L., Shawn Berry and appellant standing in the hallway. She observed that Nathan L., appellant and Morrison, who was standing next to Cesar, were armed. Appellant pointed a gun at Lourdes and demanded money. She gave him $2,000 in cash and some jewelry. Maria Cardenas, the mother of Lourdes and Cesar, awoke and opened her bedroom door, appellant pointed the gun at her and ordered her to stay in her bed. From her room, Mrs. Cardenas heard appellant asking, "Where's the money?" Appellant entered Mrs. Cardenas' room, looked in the closet and threatened her with the gun if she moved. Lourdes testified that appellant and Morrison "went in and out of the rooms, looking for I don't know what, just shuffling things around, pointing their guns at us." They ordered Lourdes to give them things they wanted.

Morrison then took Cesar into Cesar's bedroom and closed the door. Appellant stated, "Don't do anything stupid. Jesse's crazy." Lourdes heard gunshots from Cesar's room. Morrison emerged from Cesar's room and he and appellant began shooting at Lourdes, who was standing in the doorway of her room holding her infant daughter. When Mrs. Cardenas heard gunshots, she threw herself on the floor behind her bed. She was not hit. Lourdes sustained two gunshot wounds, one to the chest and one near the right eye. Cesar died from a gunshot wound to the head.

Police investigating the shooting found bullet holes in Maria Cardenas' bed and three spent .45-caliber casings in her room. Ballistics evidence

indicated that the projectiles found in Cesar's body and in Cesar's and Lourdes' rooms were fired from Morrison's weapon, while the casings found in Mrs. Cardenas' room were fired from appellant's gun. Cesar's athletic bag, first observed and searched by police in the Cardenas living room after the shootings, was subsequently found in the home of a family friend and, when searched, was found to contain over $31,000 in cash.

Appellant was sentenced to life in prison without possibility of parole, enhanced by a five-year firearm use enhancement, for the murder of Cesar Cardenas. He also received a determinate term of 11 years, 4 months to be served prior to the life term.

Appellant contends that imposition of the firearm use enhancement was improper because he did not personally use a firearm to shoot the murder victim. He relies upon a decision by this court, *People v. Allen* (1985) 165 Cal.App.3d 616 [211 Cal.Rptr. 837].

At the time of the offense in this case, Penal Code section 12022.5, subdivision (a) authorized the imposition of a sentence enhancement of two years for any person who "personally use[d] a firearm in the commission or attempted commission of a felony . . . ." (Pen. Code, § 12022.5, subd. (a).) The question of what constitutes personal use in the context of this section is not a new or novel question.

As we will demonstrate, it is clear from the case law that use encompasses a situation where the defendant is armed and uses his firearm in furtherance of a series of related offenses that culminates in a fatal or near fatal shooting even though the defendant does not personally fire the actual shot.

We begin our review of relevant case law with *People v. Johnson* (1974) 38 Cal.App.3d 1 [112 Cal.Rptr. 834], disapproved on other grounds in *People v. McDonald* (1984) 37 Cal.3d 351, 371 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011]. In *Johnson*, appellant and two other men robbed a liquor store. Appellant and another defendant were armed. The owner of the store was shot to death by appellant's codefendant. Although he did not fire the fatal shot, appellant did hold a gun on the owner and demand that he open the store safe. Appellant was convicted of first degree murder with an enhancement for firearm use. On appeal, he challenged the enhancement on the grounds that he did not personally use a gun in the owner's murder. The appellate court rejected the argument.

"Here each defendant personally held a revolver. Although Kelly did not personally fire the shot which killed Nemie, he personally used a revolver in

the series of joint offenses. Section 12022.5 penalizes those who use firearms in the commission of the listed crimes. A weapon is used within the meaning of section 12022.5 not only when it is fired, but when it is pointed at a victim to enforce a demand. [Citation.] A person commits a crime when he aids and abets it. [Citation.] Johnson and Kelly committed three joint crimes in the liquor store holdup, including the murder of Nemie. Even though Kelly did not personally shoot Nemie, he used a pistol in his commission of Nemie's murder. He is liable to the added penalty with reference to the murder of Nemie, even though he did not do the actual shooting." (*People* v. *Johnson, supra*, 38 Cal.App.3d at p. 12, italics omitted.)

*Johnson* was cited in *People* v. *Walker* (1976) 18 Cal.3d 232 [133 Cal.Rptr. 520, 555 P.2d 306], a case that seemingly limited the definition of personal use where there was no evidence that the defendant was armed much less that he had fired at anyone. In *Walker*, the defendant and two other men followed the victim into an alley where he was shot and killed. A gun found in the alley was identified as the murder weapon but there were no witnesses as to which of the three men shot the victim.

On appeal from his murder conviction, appellant attacked the finding that he used a firearm on the grounds that the trial court improperly instructed the jury on "use" and there was insufficient evidence.

The Supreme Court discussed and distinguished *Johnson*: "Clearly *Johnson* does not support an instruction allowing a finding that a defendant is deemed to use personally a firearm which is in fact used by an accomplice in the perpetration of the charged crime. It stands instead for the proposition that a weapon may be used in the perpetration of a crime even though it is not used to inflict personal injury." (*People* v. *Walker, supra*, 18 Cal.3d at p. 240, fn. omitted.) The court held it was error to have instructed the jury "that it need not be proved that the defendant physically used the gun so long as the jury was satisfied that someone during the perpetration of the offense did use the weapon . . . ." (*Id.* at p. 243.) Further, "the rules which make an accused derivatively liable for a crime which he does not personally commit, do not at the same time impose a derivatively increased punishment by reason of the manner in which a confederate commits the crime." (*Id.* at p. 242.)

■ *Walker* left intact the holding in *Johnson* that a defendant who personally uses a firearm in a series of joint offenses may be found to have personally used a firearm in a shooting though he did not fire the actual shot.

What the *Walker* court did was to distinguish between this situation and one in which there is no evidence the defendant was armed, in which case he cannot be found to have personally used a firearm simply because a codefendant did. That it was the intention of the *Walker* court to address this latter situation is made clear by its disapproval of *People* v. *Bush* (1975) 50 Cal.App.3d 168 [123 Cal.Rptr. 576], a case in which an unarmed defendant was found to have personally used a firearm while taking his victims' wallets while his codefendant held a gun on the victims. (*People* v. *Walker*, *supra*, 18 Cal.3d at p. 240.)

Moreover, in a more recent case also called *Walker*, *People* v. *Walker* (1988) 47 Cal.3d 605 [253 Cal.Rptr. 863, 765 P.2d 70], the Supreme Court affirmed the viability of *Johnson* though it did not refer to *Johnson* by name. In the later *Walker* case, the court rejected the argument that "the gun-use allegation under the murder count could only be found true if defendant *used* the gun to commit the murder" where the defendant, though he did not fire the fatal shot, "expressed a clear desire to leave no witnesses," had used his gun to "herd his victims into the back room [of a liquor store], assaulted Romero in an attempt to kill him, and ordered Vasquez and Zamora to their knees." (*Id.* at p. 635, original italics.) The court said of these circumstances: "Even assuming for sake of argument that defendant's companion fired the shots, we do not find defendant's own gun use so separate from the actual shootings that prejudice could be inferred from the court's failure to more fully instruct [on use]." (*Ibid.*) This in effect restates the holding of *Johnson*.

Further support for *Johnson* is also found in cases from the Court of Appeal. In *People* v. *Hankey* (1989) 215 Cal.App.3d 510 [263 Cal.Rptr. 615], the defendant and three friends set out to commit a robbery. Defendant and a codefendant were armed. The men dragged a woman from the street to her car where defendant threatened to shoot her if she did not release her car key. She was shot by his codefendant. On appeal, he challenged imposition of the use enhancement. The court rejected the argument. "[T]he crime [of which defendant was convicted] might more accurately be characterized as, 'a robbery in the furtherance of which death occurs.' There being no question that appellant personally used a firearm during the course of the instant robbery, the enhancement was entirely proper regardless of whether or not he also personally shot the victim. [Citations.]" (*Id.* at p. 513.)

In *In re Antonio R.* (1990) 226 Cal.App.3d 476 [275 Cal.Rptr. 442], appellant fired a shot into a crowd of rival gang members from the back of a truck in which he and his girlfriend were passengers. Someone in the

crowd fired back. Appellant was convicted of murder on a theory of vicarious liability. On appeal, he challenged imposition of the use enhancement, citing *People* v. *Walker, supra,* 18 Cal.3d 232, and *People* v. *Allen, supra,* 165 Cal.App.3d 616.

The court distinguished these two cases as standing "for the proposition that one who does not personally use a firearm may not suffer a section 12022.5 enhancement. Those cases did not consider whether the enhancement applies to one who personally uses a firearm but is only vicariously liable for the underlying crime. . . . [¶] . . . As we read the statute, one who commits an act which renders him criminally liable, whether directly or vicariously, is subject to the section 12022.5 enhancement if he personally uses a firearm during that act." (*In re Antonio R., supra,* 226 Cal.App.3d at p. 479.)

Finally, in *In re Londale H.* (1992) 5 Cal.App.4th 1464 [7 Cal.Rptr.2d 501], appellant and a codefendant fired into a crowd, codefendant killing a third man. Convicted of manslaughter, appellant appealed imposition of weapon's use enhancement because he did not fire the fatal shot. The court rejected his claim. "The legislative purpose of section 12022.5 is to deter the use of firearms. [Citations.] . . . [Such] intent to deter firearm use in the commission of a felony requires that 'use' be broadly construed. . . . [¶] . . . The deliberate discharge of a firearm into a multitude of people with little disregard of the consequences is an inherently dangerous act likely to result in death or great bodily harm. [Citation.] . . . This is exactly the sort of conduct the Legislature, in enacting section 12022.5, sought to deter and punish more severely. In the instant case, it is merely fortuitous that the victim was struck by a single shotgun pellet presumably fired by appellant's codefendant." (*In re Londale H., supra,* at p. 1467.)

In each of these cases, imposition of the weapons use enhancement was affirmed even though the defendant, while armed, was not the person who fired the fatal shot. Two cases, by contrast, have reversed findings of use in similar factual situations.

In *People* v. *Allen, supra,* 165 Cal.App.3d 616, appellant and his codefendant entered the house of Gregory Ainsworth for the sole purpose of killing Ainsworth and eliminating any witnesses to the murder. The two men took Ainsworth into the kitchen where he was shot to death. Defendant then fired at and hit another person in the house and fired at a second woman without hitting her. He was convicted of murder and a use enhancement was imposed.

On appeal, this court struck the use enhancement, stating that where the evidence did not establish which of the defendants shot Ainsworth, the state had failed to carry its "burden of establishing Allen's personal use beyond a reasonable doubt. [Citation.]" (*People* v. *Allen, supra,* 165 Cal.App.3d at p. 626, italics deleted.)

In reaching this conclusion, the opinion did not discuss either *People* v. *Johnson, supra,* 38 Cal.App.3d 1, or *People* v. *Walker, supra,* 18 Cal.3d 232, and, therefore, did not consider the possibility that Allen's avowed intention to kill Ainsworth and eliminate any witnesses and the fact that he was armed with and used his gun, albeit on another victim, constituted a use for the purposes of Penal Code section 12022.5.

In *People* v. *Nguyen* (1988) 204 Cal.App.3d 181 [251 Cal.Rptr. 40], appellant and a codefendant robbed a liquor store. Both were armed, but the codefendant, not appellant, shot the victim storeowner. The appellate court reversed the finding of use in a single sentence, citing the earlier *Walker* decision (18 Cal.3d 232): "Here, the evidence supports a finding of Nguyen's use of a firearm during the robbery but not the attempted murder. [Citation.]" (*Id.* at p. 194, italics deleted.) Again, the court did not discuss *Johnson* or its possible application to the facts of the case.

The failure of *Allen* and *Nguyen* to consider the rule set forth in *Johnson* renders them less than persuasive on the subject of use under Penal Code section 12022.5, and we do not follow them.

The instant case provides a factual situation where the *Johnson* logic applies. Appellant went to the Cardenas house for the purpose of committing robbery. He was armed and used his gun in the course of the robbery to shoot at the two victims who survived. His codefendant shot and killed Cesar Cardenas during the robbery. We conclude that under these facts appellant's use of a firearm was part of a related series of crimes and therefore use was established for purposes of Penal Code section 12022.5.

One other contention must be addressed. The Attorney General concedes that Penal Code section 12022.5 as it existed at the time of the offense, authorized a firearm use enhancement of two years. Thus, imposition of a five-year enhancement was improper and must be modified.

The judgment is affirmed in all respects except that the Penal Code section 12022.5 enhancement is modified from five years to two years.

Epstein, J., and Vogel (C. S.), J., concurred.