Filed 5/28/15  P. v. Walker CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CLINTON TYRONE WALKER,<br><br>    Defendant and Appellant. | G050683<br><br>(Super. Ct. No. FSB901542)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, Michael A. Smith, Judge.  (Retired judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

*             *             *

# INTRODUCTION

Defendant Clinton Tyrone Walker appeals from the judgment entered after a jury found him guilty of the first degree murders of Samuel Langston and Lashanne McDaniels. The jury found true the special circumstances that Walker committed multiple murders and committed the murders during the commission of a robbery, and also found true several firearm enhancement allegations. Walker's sole argument on appeal is that insufficient evidence supported the jury's finding that he personally and intentionally discharged a firearm which caused the death of Langston, within the meaning of Penal Code section 12022.53, subdivisions (c) and (d). (All further statutory references are to the Penal Code unless otherwise specified.)

We affirm. Substantial evidence supported the jury's finding there was only one gun involved in the murders and that it was Walker who personally and intentionally discharged the gun that caused Langston's death.

# SUMMARY OF RELEVANT FACTS[1]

In April 2009, Billie Leonard lived in a house in the City of San Bernardino with her daughter, Camille Leonard.[2] Billie rented out the back room of the house to her friends, Richard Sanchez, his mother, and his brother.

Terrence Smith was Billie's cocaine supplier. Billie used about $20 worth of cocaine a day. In April 2009, she saw Smith daily.

On April 12, 2009, Smith came over to Billie's house; he was accompanied by Langston whom he introduced to Billie as "Papa." Smith asked Billie if she would

---

[1] Our summary of facts is limited to those facts relevant to the single issue raised in this appeal.

[2] We refer to Billie Leonard and Camille Leonard by their first names for the purpose of clarity; we intend no disrespect.

allow Langston to come to her house the following day to cut up drugs for Smith; he offered to pay her $60. Billie agreed.

On April 13, 2009, around 4:00 p.m., Langston, in the company of McDaniels, arrived at Billie's house. Billie had met McDaniels three or four times before that day. Langston parked his black Dodge Charger in the driveway, and he and McDaniels knocked on the front door.

Billie asked Langston and McDaniels if they were going to come inside the house. She was told they "were supposed to wait for Terry [Smith]." They waited outside on the front porch for about 15 minutes, then Billie let them into the house and into her bedroom.

About 15 minutes later, Smith arrived at Billie's house with Walker and Anthony Dwight Scott. Walker and Scott sat down on the couch in the living room while Smith went into Billie's bedroom to talk to Langston and McDaniels. Billie confronted Smith about bringing Walker and Scott with him, stating: "Terry, that's not cool, because they're conducting business in there. And I don't know them." (Billie had never met either Walker or Scott before that day.) Smith responded, "Oh, they my homies. They okay." Billie said, "I don't care, I don't know them. Close the door." Smith assured her: "Well, we're not going to be here that long. We're getting ready to leave and go to the store."

Camille came home after running an errand to find Walker and Scott sitting in the living room. Camille complained about them being in her house, stating, inter alia, "I don't know these two." Smith told Camille to calm down.

Smith, Walker, and Scott left Billie's house, having been there for 10 minutes at the most. Billie locked the front door behind them.

While Langston and McDaniels were using Billie's room, Billie watched a sporting event for an hour or two in Camille's room. Eventually, McDaniels came out of Billie's room. She told Billie that she and Langston wanted to talk to her and they "were

3

done." Billie went to her bedroom and she noticed things that had not been there before Langston and McDaniels had arrived, including a plate with a razor on it and a box of plastic sandwich bags.

Billie sat down on her bed. Langston received a phone call from Smith and spoke with him for a minute or two. McDaniels took a plate to the kitchen; when she returned to the bedroom, Langston asked her for some of the drugs they had cut up. McDaniels retrieved a baggie, containing what Billie recognized as rock cocaine, from her bra and handed it to Langston. Langston sat at the desk and "got out six orders' worth," explaining that Smith had said Walker and Scott who had been with him were coming back to the house to "get a 60." McDaniels sat down on the bed next to Billie.

Meanwhile, Camille's boyfriend, Timothie Newton, came over to the house around 6:30 p.m.; he and Camille went into her bedroom. Camille prepared to start a load of laundry.

Camille heard a knock at the front door. She went to the front door, and asked, "[w]ho is it?" She heard someone on the other side of the door respond, "Walt." Camille asked, "who they were here to see." She heard someone ask if Papa was still in the house. Camille knocked on Billie's bedroom door to let Langston know there was someone at the door to see him. She heard Langston say, "[o]kay." Billie testified that when there was a knock at the door, Langston said, "[o]h, that's them. That's for me."

Camille looked out the window to see who was at the door; she saw Walker and Scott. She then walked backed to her bedroom, grabbed a basket of clothes, and walked to the garage to do a load of laundry. As she was walking out to the garage, she turned and saw Langston walk out the door.

Two or three minutes after he had left Billie's bedroom, Langston returned to the bedroom, and told Billie and McDaniels that he had come to get his car key because "they wanted to see the scale." He retrieved a key off the table and left the bedroom.

4

Because Billie's ankle had been hurting, McDaniels wrapped it and then assisted her in the bathroom. While they were in the bathroom, Billie heard running on the porch steps, the door bang open, a gunshot, and a thud on the floor.

A man with a gun then entered the bathroom. Billie had told the police it was Walker who had entered the bathroom with a gun. At trial, she testified that she had originally thought Walker, whom she considered to be "the lighter-skinned one," to have been the one with the gun. But Billie explained that she had changed her mind and now believed Scott had the gun because "[e]very time I close my eyes and I see that gun, I see a dark hand coming behind that bathroom with the gun" and she thought Walker was "[j]ust a little lighter" than Scott.[3]

The man with the gun said: "Bitch, get up. Don't look at me. Don't say nothing, and come in the living room." Billie went into the living room where she saw Langston lying on the floor with blood coming out of his head. She was told to lie face down on the floor; she complied.

Newton was in Camille's bedroom when he heard the gunshot; he ran to the closet and hid. He heard someone yelling in the bathroom; then, a man with a gun came into Camille's bedroom, and told Newton to get out of the closet, put his hands up, and go to the living room. Newton was directed to lie down in the living room where he saw a "dead body" and Billie lying on the floor, and "another guy" standing.

After Camille heard the gunshot, she went back inside the house because she wanted to make sure Newton was okay.[4] Camille testified that when she was in the doorway between the kitchen and the living room, she was met by Walker who stood in front of her and held a gun to the side of her face.

---

[3] Walker and Scott are both African-American.

[4] Before Camille had gone back in the house, Sanchez appeared and said he thought someone had just been shot inside the house.

5

Camille saw that Newton had already been placed on the living room floor near her bedroom door and also saw Langston "[l]aying on the ground like he was dead." Newton testified that when Camille entered the living room, "the guy with the gun told her to get on the ground," and he was the same person who had contacted Newton in the bedroom. Billie testified it was Walker who brought Camille into the living room and "the gun" was pointed at Camille at that point in time. Camille complied with the directions and was placed on the floor near Langston. Newton did not remember seeing "the other individual" with a gun.

Walker and/or Scott repeatedly asked McDaniels where the drugs and money were. They asked McDaniels for "his" keys, which Camille understood as referring to Langston's keys. McDaniels told them she did not know anything. They told McDaniels that "Terry said y'all cutting up a whole bunch of cookies and dope, so we know it's in here. Where's it at?"[5] McDaniels told them, "[i]t's not hers, she doesn't know, it's his." She stated the drugs were Langston's and she did not know what he had done with them. Scott had McDaniels lie down on the floor.

Scott starting going through Langston's pockets. Walker tried to get Langston's keys; Camille heard when "he pulled out the keys, 'cause [she] heard them jangling." Walker told McDaniels to get up, walk to Billie's bedroom, and lie face down on the bed. Immediately after McDaniels was taken into the bedroom, Walker moved Billie, Camille, and Newton into Billie's bedroom and told them to get in the closet. As they were being placed in the closet, Camille testified that Walker noticed the watch Newton was wearing and directed him to take it off and give it to Walker; Newton complied.[6]

---

[5] Billie testified that "cookies" is a term for cut-up cooked cocaine, which look like sugar cookies.

[6] Newton testified that the man who took his watch was "the one that had the gun."

Camille heard Walker again ask McDaniels where the money was and, when McDaniels continued to say she did not know where anything was, "they" said, "[y]eah, you know where it's at. Terry told us that you were with him all day, that you know where the dope and the money is at." McDaniels continued to say she did not know where anything was and she had been just talking in the bedroom.

McDaniels's cell phone began to ring. McDaniels asked if she could answer it because her children were calling and she wanted to let them know she was okay. Walker and Scott told her to shut up.

Billie heard either Walker or Scott say, "[b]itch, you have until the count of 3 to tell us where the stuff is." She heard one of them say, "1, 2," and then Billie and Camille heard a gunshot. Camille testified that they had been in the closet for about five minutes before they heard the gunshot. Billie heard running and the sound of either the back door or the front door closing. She also heard a gurgling sound that she thought was coming from Langston. Billie walked out of the closet and saw McDaniels, on the bed, with a gunshot wound in her head. Camille and Newton ran out of the house and Billie called 911. Langston's Dodge Charger was no longer in the driveway.

Autopsies of Langston's and McDaniels's bodies confirmed each had died from a gunshot wound to the head. Langston was shot in the head from a distance of "more than a foot, but less than a few feet."

PROCEDURAL HISTORY

Walker was charged in an information with the murders of McDaniels and Langston, each in violation of section 187, subdivision (a). The information alleged, as special circumstances, that Walker committed multiple murders, within the meaning of section 190.2, subdivision (a)(3), and committed the murders during the course of a robbery, within the meaning of section 190.2, subdivision (a)(17). As to each count, the information alleged Walker (1) personally used a firearm within the meaning of

7

section 12022.53, subdivision (b); (2) personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c); and (3) personally and intentionally discharged a firearm causing death to McDaniels and Langston, within the meaning of section 12022.53, subdivision (d). Scott was charged in the same information with the same offenses and enhancement allegations.[7]

Following Walker and Scott's first jury trial, the trial court declared a mistrial after the jury was unable to reach a verdict. Following the second jury trial, the jury found Walker guilty of both murder offenses and found true the special circumstances and enhancement allegations except the allegation that he had personally and intentionally discharged a firearm causing death to McDaniels. The jury found Scott not guilty of all charges.

The trial court denied Walker's motion for a new trial. The court imposed a total prison sentence of (1) two consecutive life terms without the possibility of parole for the murder offenses; (2) a term of 25 years to life for the finding that he had personally and intentionally discharged a firearm, resulting in Langston's death, to run consecutive to the life sentence imposed for McDaniels's murder; and (3) a 10-year term for the firearm enhancement under section 12022.53, subdivision (b), found true as alleged in connection to McDaniels's murder, to run consecutive to the life term imposed for McDaniels's murder. The trial court stayed execution of sentence as to the remaining enhancement allegations found true as to the murder of Langston.

Walker appealed.

---

[7] At some unspecified point in the proceedings, the prosecution no longer pursued the personal use and intentional discharge of a firearm enhancement allegations under section 12022.53, subdivisions (c) and (d) against Scott. The information originally contained a third count for first degree robbery alleged against both Walker and Scott, which the trial court dismissed.

DISCUSSION

I.

STANDARD OF REVIEW

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) The testimony of a single witness, unless physically impossible or inherently improbable, is sufficient to support a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

"The standard of review is the same in cases in which the prosecution relies on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66 . . . .) '"Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt."' (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793 . . . .)" (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 879.)

9

SUBSTANTIAL EVIDENCE SUPPORTED THE FINDING THAT WALKER PERSONALLY AND INTENTIONALLY DISCHARGED A FIREARM AND THEREBY CAUSED LANGSTON'S DEATH.

Walker's sole argument on appeal is that insufficient evidence supported the jury's finding that Walker "was the person who shot and killed Mr. Langston" within the meaning of section 12022.53, subdivisions (c) and (d).

Section 12022.53, subdivision (c) provides: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), personally and intentionally discharges a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 20 years."

Section 12022.53, subdivision (d) provides: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 26100, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

Here, substantial evidence supported the jury's finding that Walker personally, intentionally, and fatally shot Langston. Billie, Camille, and Newton each testified that he or she saw only one gun on the night of the murders. Billie testified as follows:

"Q  Did you see Papa get shot?

"A  No.

"Q  Saw two people after the 'pow,' in your house?

"A  Correct.

"Q  How many guns did you see?

"A  I remember one.

10

"Q  Pardon me?

"A  I remember one.

"Q  Only one gun you ever saw.  And it was, according to you, a .38?

"A  But I was mistaken.  I didn't know what caliber the gun was.  I just knew it was a gun."

Billie also testified she never saw a gun in the hand of the other assailant.

Camille similarly testified that she saw only one gun that evening, and saw it in Walker's hand:

"Q  . . . Now, how many guns did you see that late afternoon or early evening?

"A  One.

"Q  And in whose hands did you see that gun?

"A  Defendant Walker

"Q  The only person who you ever saw hold a gun; [i]s that correct?

"A  Yes, sir."

Newton also testified that he only remembered seeing one person with a gun that night.

Trial testimony showed Walker was holding the gun immediately after Langston was fatally shot.  Camille unequivocally testified that after hearing the gunshot, which she would later learn fatally wounded Langston, she rushed into the house to be met, in the doorway between the kitchen and the living room, by Walker who held a gun to her face.  Newton testified that after hearing the gunshot that killed Langston, the "guy with the gun" contacted him in Camille's bedroom and directed him to lie down in the living room; he also was the one who told Camille to get on the floor in the living room.

Billie testified that it was Walker who brought Camille into the living room.  Billie also testified that when Camille was brought into the living room, "the gun" was pointed at her.

11

Substantial evidence therefore supported the finding that Walker personally and intentionally discharged the gun, which resulted in Langston's death.

That there was only one gun involved, which Walker used, was consistent with the prosecution's theory of the case. The prosecution did not ask the jury to make findings regarding whether Scott personally and intentionally discharged a firearm, causing death, pursuant to section 12022.53, subdivisions (c) and (d); the jury instructions and verdict forms elicited such findings only for Walker. Furthermore, during rebuttal argument, the prosecutor argued that Walker was the one "doing the killings here" while Scott "was assisting him."

The prosecutor further argued: "[Defense c]ounsel says, well, we don't know who actually did the shooting. Well, we do know that the shot goes off, [Sanchez] runs outside, sees Camille. Camille immediately comes back in. And who's got the gun in his hands? Walker. So, we do know who did the shooting. We know who had the gun. We know who was doing the killings here."

Walker argues insufficient supports the finding he fatally shot Langston in light of Billie's testimony that, as of the time of trial, she had changed her mind regarding who the gunman was. Billie testified that she remembered telling the police that it was Walker who had the gun. She testified that at the preliminary hearing, she had stated she had not seen the gunman, as follows:

"Q Do you remember testifying at the preliminary hearing in this matter that was before the trial?

"A Hmm-hmm.

"Q And do you remember saying you didn't see who held the gun, that they just put their hand through the door with a gun?

"A Which is why I, when I said when I close my eyes today, all I see is a hand, a dark hand coming around the bathroom door with a gun. Because you could have, you would have to open up the door to—

12

"Q  So—

"A  Yeah.

"Q  So, you didn't see the person then at that time, the face?

"A  The first thing I saw was the gun.  Then I saw the face.

"Q  But that's not what you said at the preliminary hearing.  You said you didn't see the person, correct, if you remember?

"A  At the preliminary hearing, I did say that I didn't see the person."

At trial, Billie testified that she thought Walker, who, she said, was the lighter-skinned defendant, was the one with the gun, but that now, "[e]very time I close my eyes and I see that gun, I see a dark hand coming behind that bathroom with the gun." She explained that because Scott has darker skin, she had changed her mind and thought Scott must have been the gunman.

The jury was well within its province to reject Billie's testimony on this point.  "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts.  [Citation.]  Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.  [Citation.]" (*People v. Young*, *supra*, 34 Cal.4th at p. 1181.)  "'"[T]he jury properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material."'" (*People v. Fuiava* (2012) 53 Cal.4th 622, 715, fn. 34.)

Walker also argues this "case closely resembles" *People v. Allen* (1985) 165 Cal.App.3d 616.  That case is inapposite.  In that case, there was evidence that two defendants were part of "a preconceived 'assassination' plot," but no evidence showed which of the two was the actual shooter for purposes of finding whether either personally used a weapon in committing murder within the meaning of section 12022.5.  (*People v.*

13

*Allen*, *supra*, at p. 626.)  As discussed *ante*, eyewitness testimony put the single gun involved in the crimes in Walker's hand.


DISPOSITION

The judgment is affirmed.



FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.