Filed 2/21/14  P. v. Wright CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B245443 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA080814) |
| v. | |
| ELI DOMINIC WRIGHT, | |
| Defendant and Appellant. | |
| In re ELI DOMINIC WRIGHT | B250798 |
| on Habeas Corpus. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Darrell S. Mavis, Judge.  Reversed with directions.

ORIGINAL PROCEEDING; petition for a writ of habeas corpus.  Petition denied.

Kurt David Hermansen, under appointment by the Court of Appeal, for Defendant, Appellant, and Petitioner.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Eric J. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

Defendant Eli Dominic Wright appeals from the judgment entered following a jury trial in which he was convicted of shooting from a motor vehicle at a person, in violation of Penal Code section 12034, subdivision (c).[1]  Defendant contends the trial court erred by failing to instruct on an element of the offense, failing to instruct upon discharging a firearm with gross negligence as a lesser included offense, and awarding the victim restitution.  He further contends the evidence was insufficient to support his conviction.

We conclude substantial evidence supported defendant's conviction and the trial court properly instructed the jury on the elements of shooting from a motor vehicle at a person.  However, we conclude the trial court prejudicially erred by failing to instruct sua sponte upon the lesser included offense of discharging a firearm with gross negligence in violation of section 246.3, subdivision (a).  Accordingly, we reverse defendant's conviction and remand for either retrial or reduction of his conviction to the lesser included offense.

Defendant also petitions for a writ of habeas corpus, contending his girlfriend's statement to the police was coerced and should have been excluded (though defendant did not attempt to exclude that statement in the trial court) and trial counsel rendered ineffective assistance by failing to argue "the chronological impossibility" of defendant's alleged confession to the same girlfriend.  We deny the petition without prejudice. Defendant forfeited the issue of the voluntariness of his girlfriend's statement for the purpose of this appeal.  Our disposition on appeal moots the issue regarding counsel's argument.

---

[1] Undesignated statutory references are to the Penal Code.

2

## BACKGROUND

**1.    Evidence presented at first trial**

**a.    Prosecution evidence**

**(1)    August 1, 2010 fight at liquor store**

Defendant and his girlfriend, Alexis Mason, went to a liquor store in Pasadena around midnight on the night of July 31, 2010,[2] or the early morning of August 1. Defendant drove and went into the store, while Mason remained in the car. Pasadena Police Department Detective Keith Gomez subsequently retrieved the recordings from the liquor store's surveillance cameras depicting a confrontation between defendant, who had previously admitted to police that he was a member of the Pasadena Denver Lanes gang, and Trayvon Thomas, whom Gomez knew to belong to the rival Squiggly Lane gang. Trayvon Thomas was accompanied by two other known Squiggly Lane gang members. Trayvon Thomas punched defendant. Defendant seemed upset and left the store without purchasing anything. Mason testified he seemed angry and told her to drive him to his friend's home. During the drive, defendant phoned someone and told the person he had been in an altercation with, and struck by, a "Squirt" (a derogatory term for a member of the Squiggly Lane gang). Defendant may have said something about getting revenge. Mason drove defendant to his friend's house and waited in the car while defendant spoke to his friend. Mason and defendant then drove to her apartment and she went to bed.

**(2)    August 2, 2010 shooting**

Just after midnight on the morning of August 2, a green SUV or truck drove slowly west along Del Monte Street in Pasadena. It stopped in front of the driveway for 240 Del Monte Street, where Trayvon Thomas, Reginald Thomas, Paris Thomas, Tremaine Woodard, Kenya Larsuel, Courtney Scott, and Shauntice Williams resided with their grandmother. The house was known as a hangout for Squiggly Lane gang members. Larsuel, Scott, and Williams were seated in a car parked at the curb in front of 240 Del

---

[2] Undesignated date references pertain to 2010.

3

Monte, facing east. The driver of the SUV stuck a gun covered by a plastic grocery-type bag out the driver's side window and fired a shot toward the driveway.

The SUV drove a little farther and stopped again in front of the house. Scott told a police officer in the immediate aftermath of the shooting that the driver of the SUV stopped right next to her car and fired a shot directly above her car toward the house. The shooter, who seemed to be alone in the SUV, was laughing and smiling. Scott ducked and drove east on Del Monte. As she drove away, she heard three more shots. Scott told the officer she did not see anyone in or around the house at the time of the shooting. At trial, Scott claimed not to recall the shooting. According to Larsuel,[3] Scott drove away after the first shot was fired, but she heard three more shots. Larsuel also did not see anyone outside the house at the time of the shooting.

Officer Todd McDonald responded to the scene and found Tremaine Woodard lying wounded on the driveway of 240 Del Monte Street behind a partially open vehicle gate. Woodard had been shot in his lower left abdomen. He survived his wounds. McDonald stopped Kyle Traub and Trayvon and Reginald Thomas as they tried to flee and saw Paris Thomas run into the house. McDonald retrieved a mobile phone from the ground near Traub.

About 3:00 p.m. on August 2, Gomez found Scott, Larsuel, and Williams at a restaurant and interviewed all three. He testified that Scott told him she was certain that the driver of the SUV was also the shooter. When Gomez showed Scott a sixpack photographic array, she handed it back to him and became uncooperative. Gomez separately showed Larsuel a different sixpack, and she immediately pointed at defendant's photograph and began to tremble. She said the man depicted in the photograph was the driver and shooter, but she refused to circle the photograph or sign the sixpack. On August 8 Gomez showed Larsuel a new sixpack containing a more

---

[3] Larsuel was unavailable at the first trial and her preliminary hearing testimony was read into the record.

recent photograph of defendant, and she again pointed to defendant's photograph as depicting the shooter. In her preliminary hearing testimony, Larsuel claimed she pointed at two photos in the sixpack and said either one of them might have been the culprit. No one identified defendant at trial.

Mason testified that defendant phoned her early in the morning and told her that he had committed a shooting using her vehicle, which was a green Kia Sportage. Mason "believe[d]" defendant called her "a short period of time after the liquor store incident," "around that same morning." Mason was upset by what defendant had done, and thereafter defendant did not spend as much time with her.

No casings or other ballistic evidence was found at the crime scene and the gun used in the shooting was not recovered. Gomez saw a mark on the chimney that was next to the driveway gate that may have been caused by a gunshot. He saw damage to the gate itself, but could not attribute it to gunshots. The police found no damage to the home opposite 240 Del Monte Street. Gomez subsequently examined Mason's vehicle and found no damage consistent with being struck by gunfire.

## (3)     Mason's interrogation

On August 6 Gomez and Officer Kevin Okamoto arrested Mason because they believed her vehicle had been used in the shooting. They handcuffed her, took her to the police station, and Okamoto interrogated her several times while she remained handcuffed. The officers recorded part of the interrogation, but the recording was not introduced at the first trial.

Mason admitted at trial that she initially lied to Okamoto and told him defendant was not driving her vehicle. Okamoto admitted at trial that he threatened to charge her with child abuse and neglect and to have her young daughter taken away from her. She testified she feared losing her child and thought defendant's use of her vehicle might create criminal liability for her. She decided she should tell the truth so that she could reunite with her daughter and not have to worry any more. She denied that she told Okamoto what he wanted to hear to obtain her own release. She told Okamoto that

5

defendant said he had used her car in a shooting, but the conversation was unclear to her because she had just awakened and she had been drinking before she went to sleep. When Officer Okamoto asked Mason if it would "be fair to say that he, basically advised you he did a shooting against some Squigglys with your car," Mason replied, "That would be fair to say, yeah." Okamoto testified that Mason seemed confused about what day defendant had told her about the shooting and about his exact wording, but said defendant told her in person, not over the phone.

Mason also told Okamoto that she had seen defendant with a disassembled gun, but she did not think that was the gun used in the shooting. The police found the disassembled gun in Mason's apartment. Testing established it did not fire the bullet recovered from Woodard's abdomen.

Okamoto had Mason phone defendant. Defendant did not answer the call, but phoned Mason back. Okamoto listened to their conversation. Defendant instructed Mason to lie to the police and tell them the gun in her apartment belonged to someone other than defendant, she had not seen him since the fight at the liquor store, and she did not know where he was.

**(4)     Defendant's arrest, interrogation, and surreptitiously recorded custodial statements**

About 15 minutes after defendant phoned Mason, the police arrested defendant at a tattoo parlor in Pasadena in the company of other members of the Denver Lanes gang. Gomez and Okamoto interrogated him at the station. He admitted Mason was his girlfriend, but claimed he had not seen her for a couple of weeks and had never driven her car in her absence. He denied any involvement with, or presence during, the shooting.

Okamoto testified that defendant discussed the shooting with someone who visited him in jail and the conversation was recorded. According to Okamoto, defendant "mentioned that he was in custody for the incident that occurred on Del Monte and, in reality, the individuals that resided on Del Monte had shot at him and he was not the individual who actually shot in the direction of the Del Monte address." Okamoto

6

testified that defendant said he was present during the shooting, but was not the shooter. Defendant also said that the gun recovered from Mason's apartment was not the one used in the shooting. He said he had found that gun and disassembled it.

Gomez testified that in a recorded phone call from jail defendant asked his brother to get rid of a bag and its contents that defendant had left at the tattoo parlor. Defendant mentioned clothing and marijuana in the bag.

**(5)     Gang evidence**

Gomez also testified as the prosecution's gang expert. At the time of the charged shooting, the Pasadena Denver Lanes and Squiggly Lane gangs were enemies. A gang member's failure to retaliate after being assaulted would be deemed a sign of weakness that would diminish both the gang member's and the gang's reputation. In contrast, committing a violent act, including a retaliatory act, would enhance the reputation of both the gang member and his gang.

Gomez testified that Woodard was an associate of the Squiggly Lane gang and Reginald and Paris Thomas and Traub were affiliated with the gang.

In response to a hypothetical question based upon the prosecution's evidence, Gomez opined that the charged shooting would benefit a criminal street gang by enhancing its image and others' respect for it, which would in turn allow the gang to accomplish more.

**b.     Defense evidence at first trial**

Kyle Traub testified that on August 2 he and his neighbor J.R. went to a party at 240 Del Monte Street. Traub did not know whose house it was. There were 10 to 15 other people there. When Traub first arrived, he and others were "in the front yard right in front of the gate in the driveway." The gate was partially open. A car drove by and some of the people around Traub "started bitching" about the car driving by. Everyone then went through the gate into the backyard. The gate remained partially open. A little later (Traub's time estimate ran from "a couple of minutes" to 10 minutes), other people at the party began talking about the same car driving past again. Traub pulled himself up

7

on the gate to look over it and watched the car go past. It was a green SUV. At that moment, someone in the backyard started shooting. Traub jumped down, turned around, and saw someone with a gun, a revolver he thought. Traub and everyone else ran. A total of three to five shots were fired. Traub saw the shooter run out through the gate. Traub could only describe the shooter as a Black male wearing a hoodie. The person who got shot had been right by the open end of the gate, near Traub.

Traub and J.R. tried to flee or hide from the police because they had outstanding warrants. When Traub saw the police, he tried to discard his mobile phone because it contained "incriminating stuff" about drugs. Traub had put his "ugly" leather jacket in a trash can when he first arrived at the party because he thought some girls would be present.

Traub did not know the person who got shot. He was not involved with either the Denver Lanes or Squiggly gangs and did not know whether J.R. was involved with either gang.

A crime scene investigator found Traub's jacket in a recycling bin at 240 Del Monte Street. A piece of paper in the jacket pocket bore Traub's name. The investigator collected the jacket and took gunshot residue swabs from the hands of Traub, Trayvon Thomas, Paris Thomas, and Reginald Thomas.

No gunshot residue was found in the swabs of the men's hands, but gunshot residue was found on the right sleeve of Traub's jacket and multiple particles consistent with gunshot residue found on the left sleeve and both exterior pockets of the jacket. This indicated that "the jacket was in an environment in which a gun was fired or came into contact with the source of" gunshot residue, such as a firearm.

## 2. Verdict at first trial

The jury acquitted defendant of two counts of attempted murder (naming Woodard and Trayvon as victims), but convicted him of shooting from a motor vehicle at a person (naming Woodard as victim). The jury found true a gang enhancement allegation (§ 182.22, subd. (b)(1)(C)) and firearm allegations under section 12022.53, subdivisions

(b) and (c) (personal use of a gun and personal, intentional discharge of a gun). The jury could not reach a verdict on the section 12022.53, subdivision (d) allegation (personal, intentional discharge of a gun, causing great bodily injury), and the trial court declared a mistrial as to that allegation.

**3.      Retrial of section 12022.53, subdivision (d) allegation**

The prosecutor elected to retry the section 12022.53, subdivision (d) allegation. After a six-day trial, the jury made a not true finding on the allegation. We need not set forth any of the evidence presented at the second trial because it is irrelevant to the issues addressed herein.

**4.      Sentence**

The court sentenced defendant to a total of 12 years in prison, consisting of the upper term of 7 years for shooting from a motor vehicle at a person, plus a 5-year gang enhancement. The court dismissed the first jury's findings under section 12022.53, subdivisions (b) and (c) on the ground that use of a firearm was an element of the offense.[4]

## DISCUSSION

**1.      Failure to instruct on subjective awareness of a probability that shots would hit a person**

Defendant contends that the trial court failed to instruct the jury that to convict him of shooting from a motor vehicle at a person it must find that he was subjectively aware of the probability that one or more shots would strike a person. He argues that the instructions given permitted him to be convicted of the offense "if he acted with mere gross negligence."

---

[4] Because shooting from a vehicle at a person is not an offense listed in section 12022.53, subdivision (a), the enhancements were statutorily inapplicable.

9

### a. Duty to instruct and standard of review

"[A] trial court in a criminal case is required—with or without a request—to give correct jury instructions on the general principles of law relevant to issues raised by the evidence." (*People v. Mutuma* (2006) 144 Cal.App.4th 635, 640.) This includes instructing on all of the elements of the charged offense. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311.)

We independently assess whether instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) The correctness of jury instructions is determined from the entire set of instructions, not just an isolated instruction or part thereof. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1075.)

### b. Elements of shooting from a motor vehicle at a person

Former section 12034, subdivision (c), (now section 26100, subd. (c)), provided, "Any person who willfully and maliciously discharges a firearm from a motor vehicle at another person other than an occupant of a motor vehicle is guilty of a felony punishable by imprisonment in state prison for three, five, or seven years."

Shooting from a motor vehicle at a person is a general intent crime. (*People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1500–1501 (*Hernandez*).) Its elements are "(1) acting willfully and maliciously, and (2) shooting from a motor vehicle at a person outside a motor vehicle." (*Id.* at p. 1501.) "'Conviction under a statute proscribing conduct done "willfully and maliciously" *does not require proof of a specific intent.* [Citation.]'" (*Id.* at p. 1500.) Instead, the defendant must merely intend to do the proscribed act. (*Ibid.*) "The fact subdivision (c) of section 12034 requires that the perpetrator shoot 'at' a particular target does not transform the crime into a specific intent offense." (*Ibid.*) "'[T]he act of shooting "at" a proscribed target'" is committed either when the defendant shoots directly at the proscribed target or "'when the defendant shoots in such close proximity to the target that he shows a conscious indifference to the probable consequence that one or more bullets will strike the target or persons in or around it. The defendant's conscious indifference to the probability that a shooting will

10

achieve a particular result is inferred from the nature and circumstances of his act.'" (*Id.* at p. 1501.)

**c.      Instructions given**

The trial court used CALCRIM No. 968 to instruct the jury on the elements of shooting from a motor vehicle at a person:  "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully and maliciously shot a firearm from a motor vehicle; [¶] AND [¶] 2. The defendant shot the firearm at another person who was not in a motor vehicle.  [¶]  Someone commits an act willfully when he or she does it willingly or on purpose.  [¶]  Someone acts maliciously when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to disturb, defraud, annoy, or injure someone else."  The court also instructed the jury that shooting from a motor vehicle at a person was a general intent crime and explained, "For you to find a person guilty of this crime . . . , that person must not only commit the prohibited act, but must do so with wrongful intent.  A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intend to break the law."  (CALCRIM No. 252.)

During its deliberations, the jury sent the court a note asking, in part, "For count 3, can a shot at a person's residence qualify as a shot at a person?"  The court conferred with counsel regarding the proper response.  With the express agreement of defense counsel and in reliance upon *Hernandez*, *supra*, 181 Cal.App.4th at page 1501, the court provided the jury with the following written response:  "[P]lease incorporate the following additional language in instruction 968 for Count three:  [¶]  Someone shoots 'at another person' if he or she shoots in such close proximity to the person that he shows a conscious indifference to the probable consequence that one or more bullets will strike the person or persons in or around the target."

**d.      The trial court properly instructed the jury on the elements of the offense**

CALCRIM Nos. 252 and 968 correctly informed the jury of the elements of shooting from a motor vehicle at a person.  (*Hernandez*, *supra*, 181 Cal.App.4th at

11

p. 1501.) The court's additional instruction using both the law and language set forth in *Hernandez* properly responded to the jury's question, which pertained to the scope of the phrase "shot the firearm at another person" used in CALCRIM No. 968. We believe the court's supplemental instruction that "conscious indifference to the probable consequence" that a person would be struck by a bullet necessarily incorporates the element of subjective awareness defendant argues was omitted, in that an actor can only be *consciously* indifferent to the probability of a result if he is subjectively aware of that probability.

Accordingly, we conclude the trial court neither omitted nor misstated an element of the offense.

**2. Sufficiency of evidence**

Defendant contends the evidence was insufficient to support his conviction. He specifically argues that there was no evidence he was subjectively aware of a substantial and unjustifiable risk that he would shoot anyone.

**a. Standard of review**

To resolve an issue of the sufficiency of evidence, we review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt. (*People v. Tully* (2012) 54 Cal.4th 952, 1006.) Substantial evidence is """"evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."""" (*Ibid*.) We presume the existence of every fact supporting the judgment that the jury could reasonably have deduced from the evidence and make all reasonable inferences that support the judgment. (*People v. Barnes* (1986) 42 Cal.3d 284, 303; *People v. Catlin* (2001) 26 Cal.4th 81, 139.)

**b. Sufficient evidence supports defendant's conviction**

Defendant's contention relies upon Scott's statement and Larsuel's testimony that they did not see anyone in the front yard at the time of the shooting. However, reviewing the entire record—including defense witness Traub's testimony—in the light most

12

favorable to the judgment, we conclude substantial evidence supports defendant's conviction. According to Traub, a party was occurring at 240 Del Monte at the time of the shooting, with 10 to 15 people in attendance. When Traub arrived, he and at least some of the other party-goers were in the front yard. Sometime around the time Traub arrived, a car drove by, upsetting the people at the party. It was the same green SUV that drove by again at the time of the shooting. The jury reasonably could have inferred that the driver of the car saw the people in the yard and knew that people were present there. The people in the front yard then went into the backyard, but the gate remained partially open. Traub's testimony about the gate was consistent with that of Officer McDonald, who found the gate partially open when he responded to the shooting call.

Notwithstanding the partially closed gate, the people in the backyard were able to see the car when it came driving down the street again. Their remarks about the car caused Traub to pull himself up on the gate so he could see over it. When he pulled himself up on the gate, he saw the same green SUV driving past. The jury reasonably could have inferred that, because the people in the yard could see the car, the driver of the car could see them, or the driver at least could see Traub when he pulled himself up to look over the gate.

Although Traub also testified the shots came from behind him, the jury was entitled to reject portions of his testimony and accept other portions. (See *People v. Allen* (1985) 165 Cal.App.3d 616, 623.) Based upon the evidence from Scott and Larsuel, the jury reasonably could have concluded beyond a reasonable doubt that the driver of the car, not the backyard shooter described by Traub, was the person who fired the shots. Given the description of the car and Mason's testimony that defendant admitted committing a shooting while driving her car, the jury reasonably could have concluded beyond a reasonable doubt that defendant was the shooter.

Accordingly, we conclude that substantial evidence established that defendant willfully and maliciously shot a firearm from a motor vehicle at another person who was not in a motor vehicle. In particular, substantial evidence supported the jury's implied

finding that defendant fired the gun in "such close proximity to the person that he show[ed] a conscious indifference to the probable consequence that one or more bullets [would] strike the person or persons in or around the target," as the trial court instructed. In other words, the jury necessarily found that defendant was subjectively aware of a substantial and unjustifiable risk that he would shoot someone.

**3.      Failure to instruct sua sponte upon grossly negligent discharge of a firearm under section 246.3 as a lesser included offense**

Defendant contends that the trial court erred by failing to instruct sua sponte on a violation of section 246.3, subdivision (a), negligent discharge of a firearm, as a lesser included offense of shooting from a motor vehicle at a person. The Attorney General does not contest that a violation of section 246.3, subdivision (a) is an offense necessarily included within shooting from a motor vehicle at a person, but argues there was no evidence supporting conviction of the lesser, but not the greater, offense.

**a.      Lesser included offenses and the duty to instruct upon them**

An offense is necessarily included in another if either the statutory elements of the greater offense or the facts alleged in the accusatory pleading include all of the elements of the lesser offense, so that the greater offense cannot be committed without also committing the lesser. (*People v. Birks* (1998) 19 Cal.4th 108, 117.)

A trial court must instruct sua sponte on a lesser included offense if there is substantial evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser. (*People v. Blair* (2005) 36 Cal.4th 686, 745.) Substantial evidence in this context is "evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." (*Ibid.*)

**b.      A violation of section 246.3, subdivision (a) is a lesser included offense of shooting from a motor vehicle at a person**

To convict a defendant of violating section 246.3, subdivision (a), the jury must find that "(1) the defendant unlawfully discharged a firearm; (2) the defendant did so

14

intentionally; [and] (3) the defendant did so in a grossly negligent manner which could result in the injury or death of a person." (*People v. Alonzo* (1993) 13 Cal.App.4th 535, 538.)

*People v. Ramirez* (2009) 45 Cal.4th 980 (*Ramirez*) dealt with an analogous situation. There the issue was whether section 246.3 is a lesser included offense of section 246, which provides, "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house, occupied building, occupied motor vehicle, occupied aircraft, inhabited housecar . . . or inhabited camper . . . is guilty of a felony." The California Supreme Court held it was. (*Id.* at p. 990.) The court explained, "Both offenses require that the defendant willfully fire a gun. Although the mens rea requirements are somewhat differently described, both are general intent crimes. The high probability of human death or personal injury in section 246 is similar to, although greater than, the formulation of likelihood in section 246.3(a), which requires that injury or death 'could result.' The only other difference between the two, and the basis for the more serious treatment of a section 246 offense, is that the greater offense requires that an inhabited dwelling or other specified object be within the defendant's firing range. All the elements of section 246.3(a) are necessarily included in the more stringent requirements of section 246." (*Ramirez*, at p. 990.) The same result had been reached earlier in *People v. Overman* (2005) 126 Cal.App.4th 1344, 1360–1361 (*Overman*).

By parity of reasoning, a violation of section 246.3, subdivision (a) is also necessarily included within the offense of shooting from a motor vehicle at a person. Shooting from a motor vehicle at a person differs from a violation of section 246 (addressed in *Overman* and *Ramirez*) only in its requirements that the shooter fire from a motor vehicle and the "target" be a person who is not in a motor vehicle, as opposed to a house, building, occupied motor vehicle, or other "target" specified in section 246.

Accordingly, we agree with defendant's contention (and the Attorney General's implicit concession) that a violation of section 246.3, subdivision (a) is a lesser included offense of shooting from a motor vehicle at a person.

**c.** **The trial court had a duty to instruct sua sponte on a violation of section 246.3 as a lesser included offense**

Larsuel's testimony and Scott's statement to police supported a finding that no one was in the front yard or visible outside the house when the gunman fired the shot. Larsuel, Scott, and the third woman in the car were not possible victims within the scope of shooting from motor vehicle because the statute expressly excludes as victims persons inside a motor vehicle. There was no evidence that people inside the house could have been seen from outside at the time of the shooting. There also was no firm evidence at the first trial of the time elapsed between defendant's two drives past the house. Although Traub was present for both passes, he was not paying attention to the time, and his estimate of the interval between the two passes of the SUV ranged from "just a couple of minutes" to 10 minutes. Unless the men in the backyard were visible over the gate or through the opening in the gate, the jury could have inferred that, even if defendant saw the men on his first pass, he would not have known whether they were still present or had left the premises. If the jury believed Larsuel and Scott and either disbelieved Traub or did not infer from Traub's testimony that the men in the backyard were visible over the gate or through the opening in the gate, it could have concluded defendant did not demonstrate "a conscious indifference to the probable consequence that one or more bullets would strike" a person. The jury could nonetheless have found that defendant unlawfully and intentionally discharged a firearm in a grossly negligent manner that could have resulted in the injury or death of a person (and indeed did result in injury), and thus could have convicted him of a violation of section 246.3, subdivision (a) as a lesser included offense.

The Attorney General argues that instruction upon the lesser included offense was not required because Scott and the other women in the car were in the line of fire when defendant fired a shot above Scott's car, Woodard was shot, Mason testified that defendant "confessed to her that he shot at some Squigglies in her car," and defendant "claimed he saw individuals shoot at him."

16

None of these arguments are convincing. As noted, the women in the car were not victims within the scope of shooting from a vehicle at a person. They would have been "eligible" victims if the prosecutor had instead charged defendant with a violation of section 246, which includes shooting at an occupied motor vehicle. Woodard's wound establishes neither that defendant, as opposed to the mysterious backyard gunman described by Traub, shot Woodard nor that defendant knew people were present in the vicinity of his gunfire and thus acted with conscious indifference to the probability a person would be shot. Mason did not testify that defendant said he shot *at Squigglies*, only that he said he had done a shooting "against some Squigglys" while driving her car, which strongly supports an inference that he knew the house was a Squiggly Lane gang hangout, but does not establish that he knew anyone was present when he fired the shots. Finally, there was no evidence that defendant ever said he "saw individuals shoot at him." He told a visitor that "the individuals that resided on Del Monte had shot at him and he was not the individual who actually shot in the direction of the Del Monte address." The jury was not instructed on aiding and abetting principles and there was no evidence other than defendant's self-serving statements that he had an accomplice. The jury's verdict thus demonstrates that the jury rejected defendant's claim that he did not fire any shots. Even if the jury had believed the portion of defendant's statement that people at the house fired at him, the jury nonetheless could reasonably have concluded that defendant fired first, without knowing or suspecting people were present, and that someone in the backyard fired at defendant only after he fired the first shot.

Accordingly, we conclude that there was evidence that, if believed by the jury, would have absolved defendant of the greater offense of shooting from a motor vehicle at a person, but would not have absolved him of a violation of section 246.3, subdivision (a). Thus, the trial court was required to instruct sua sponte on section 246.3, subdivision (a) as a lesser included offense of shooting from a motor vehicle at a person.

17

**d.    The failure to instruct was prejudicial**

The prejudicial effect of an erroneous failure or refusal to instruct on a lesser included offense is analyzed pursuant to *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Moye* (2009) 47 Cal.4th 537, 541.)  That is, the trial court's error does not require reversal unless there is a reasonable probability that, absent the error, defendant would have obtained a more favorable outcome.  (*Watson*, at p. 836.)  Where there is "'at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result,'" the error is prejudicial.  (*People v. Mower* (2002) 28 Cal.4th 457, 484, quoting *Watson*, at p. 837.)

We note that although the Attorney General argues that the court did not err, she does not argue that any error was harmless.

Had the prosecutor charged defendant with a violation of section 246, we would necessarily conclude that the failure to instruct upon the lesser included offense was harmless.  But the prosecutor instead charged shooting from a motor vehicle at a person. The jury's question ("[C]an a shot at a person's residence qualify as a shot at a person?") strongly suggests that at least some jurors were not convinced that defendant knew that anyone was present in the vicinity in which he aimed and fired his gun.  Notably, the jury acquitted defendant of attempted murder and could not reach a verdict (at the first trial) on the allegation that defendant intentionally fired a gun, causing Woodard great bodily injury.  The jury necessarily found that defendant fired a gun and that he intended to do so.  Thus, the failure to reach a finding on the firearm enhancement allegation suggests the jury may have had doubts about either causation or the extent of Woodard's injuries, or both.  Given these verdicts, the absence of a finding on the firearm enhancement allegation, the jury's question, the undisputed testimony that no one was in the front yard, and the possibility that the jury could have had a reasonable doubt about whether defendant knew there were people in the backyard, we conclude there is "'at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result.'"

18

Accordingly, we conclude the failure to instruct was prejudicial and we reverse defendant's conviction and remand for retrial or, at the prosecutor's election, reduction of the offense to a violation of section 246.3, subdivision (a).

**4.      Remaining contentions and habeas corpus petition**

Given our disposition, we need not address defendant's remaining contentions. For the purpose of this appeal, defendant forfeited his claim that Mason's statement was coerced by failing to seek its exclusion. Given our reversal, counsel's purported ineffective assistance in failing to argue chronological impossibilities is of no consequence. We note that although counsel did not phrase her argument in the "chronological impossibility" terminology, she argued that Mason's statement to police was untrustworthy for reasons that included anger at defendant, coercive tactics by the police, lies she admittedly told the police, and multiple factual inaccuracies, including when defendant told her about the shooting. In addition, the chronological impossibility was obvious from the evidence presented and both Mason and Okamoto testified she was uncertain about when defendant told her about the shooting. Thus, it is highly doubtful the petition states a prima facie case regarding ineffective assistance.

If the prosecutor elects to retry defendant, defense counsel will be able to address the matters upon which defendant's habeas corpus petition and the remaining appellate issues are based. If the prosecutor elects to have the offense reduced to a violation of section 246.3, subdivision (a), defendant will be able to raise any appropriate claims in a new appeal or petition for a writ of habeas corpus, including the issue of ineffective assistance.

## DISPOSITION

The judgment is reversed and the cause is remanded for further proceedings in accordance with this opinion.  The petition for a writ of habeas corpus is denied without prejudice.

NOT TO BE PUBLISHED.


MILLER, J.*

We concur:


CHANEY, Acting P. J.


JOHNSON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.