Filed 9/8/14  P. v. Cervantes CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL ANTHONY CERVANTES,<br><br>    Defendant and Appellant. | B244992<br><br>(Los Angeles County<br>Super. Ct. No. BA377894) |

APPEAL from a judgment of the Superior Court of Los Angeles County. James N. Bianco, Judge.  Affirmed.

Orly Ahrony and Christopher W. Blaylock for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

A jury convicted Michael Anthony Cervantes of attempted robbery, carjacking, unlawful taking or driving of a vehicle ("joyriding") and robbery and found true related gang and firearm allegations. The trial court sentenced Cervantes to state prison for a term of 15 years to life plus 10 years. Cervantes appeals, challenging the sufficiency of the evidence and claiming one witness's testimony was improperly admitted. We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

*September 19, 2010.*[1]

At about 3:20 a.m. on September 19, 2010, Cesar Bugarin was leaving work in his red 2003 Dodge Ram truck when a silver Avalanche with four passengers inside pulled up in front of Bugarin and blocked his path. Two bald Hispanic males between the ages of 17 and 19 wearing big loose shirts got out of the Avalanche and approached Bugarin. Based on their appearance, Bugarin believed they were gang members. One pointed a "silver chrome plated" gun to Bugarin's temple and told him to get out of the truck. The men took Bugarin's cell phone, hat, credit cards and $800 in cash and drove away in Bugarin's truck.

*September 24, 2010.*

At about 8:30 a.m. on September 24, 2010, Christopher Hall was listening to music on his iPod while sitting at a bus stop in front of the animal hospital where his cousin worked. A red Dodge Ram truck with two male Hispanic teenagers inside pulled up beside Hall. Cervantes—the driver—wore an Atlanta Braves baseball cap with an

---

[1]     At trial, Cervantes was acquitted of robbery and carjacking counts relating to these events involving Bugarin (counts 7 and 8), but because these facts are relevant to a subsequent crime for which Cervantes was convicted (joyriding, count 4), we briefly summarize them here.

"A" on it.[2]  Cervantes and his passenger started "throwing 'A'" gang signs at Hall and saying "What's up nigger, fuck niggers," and "[g]ive me everything you got."  The passenger had trouble getting out of the truck for some reason so Hall was able to run to the animal hospital.

A woman inside the animal hospital (Veronica Aparicio) heard the commotion, saw the red truck and then saw Hall run to the door, saying he was "getting robbed."  She came outside and wrote down the red truck's license plate number when it circled back around the block.  As she spoke with the 9-1-1 operator to report what had happened, one of the truck's occupants called out something threatening like, "'I know where you work at[,'] like trying to say he's going to come back."

*September 25, 2010.*

The following day, at about 11:50 a.m., Michael Murillo and his two friends Juan Cazares and Emilio Gomez were installing a stereo in Murillo's Honda Accord.  Murillo went inside his house to grab a screwdriver, but as he walked back out, he saw two Hispanic males with guns had approached Cazares and Gomez and were asking where they were from, which they understood to mean a request for their gang affiliation.  They said, "Nowhere," meaning "We don't gang bang."  One of the gunmen said, "Avenues[,]" and "I know Highland Park lives here in this house."[3]  Murillo and his friends said "No one from Highland Park lives here."

One of the men pointed a "silver-ish" colored handgun at Murillo and directed him and his friends to empty their pockets.  That man and the other one with a revolver then told Murillo and his friends to take off their pants.  When Cazares "backed away a little

---

[2]  On September 30, 2010, when a police officer showed Hall a six-pack photographic lineup, Hall identified Cervantes as the driver of the truck.  At trial (two years later), he initially testified Cervantes was the passenger but then acknowledged his memory of the incident was better on September 30, 2010 than at the time of trial.

[3]  At trial, Cazares and Gomez explained Highland Park and Avenues are rival gangs in Murillo's neighborhood.

bit," the one with the handgun "pistol whipped" Cazares, hitting him across the side of his face. The same gunman directed Murillo and his friends to put the speakers in the trunk of Murillo's car, and they complied. Then the two gunmen got into Murillo's car and drove off.

Murillo called 9-1-1 (twice), and two officers arrived at his home about 40 minutes later. Murillo told Officer Gabriel Rivas and his partner the person with the handgun was "Buster from Avenues, Carlos'[s] brother." Murillo said he had gone to high school with Cervantes's brother Carlos. Murillo's car was recovered a few houses away from Cervantes's residence.

*September 27, 2010.*

At about 1:20 a.m. on September 27, 2010, Los Angeles Police Department Officers Fernando Salcedo and Francisco Serrano were on patrol when a red Dodge truck caught their attention. In "roll call" that evening, they had just been "briefed" about a red Dodge truck taken at gunpoint so they checked the truck's license plate and verified that it was the same truck (belonging to Cesar Bugarin) involved in the prior carjacking. Officer Serrano requested additional units to assist with a traffic stop while Officer Salcedo drove, following the red truck. After a few blocks, the red truck sped up and then turned onto a smaller street where it stopped at an angle, blocking all traffic. Cervantes and a female passenger jumped out of the truck and ran in different directions. Cervantes looked directly at Officer Serrano. The female passenger was found hiding in a yard nearby and taken into custody, but the officers were unable to find Cervantes that night.

When the officers impounded Bugarin's red Dodge truck, they also recovered a digital camera inside which contained photographs of Cervantes in Bugarin's truck and wearing Bugarin's hat.

Cervantes was later taken into custody and charged with the following crimes: count 1, the attempted robbery of Christopher Hall on September 24, 2010 (Pen. Code, §§

4

664 & 211 [all further undesignated statutory references are to the Penal Code]); count 2, the carjacking of Michael Murillo on September 25, 2010 (§ 215, subd. (a)); count 4, unlawful driving or taking of Cesar Bugarin's Dodge Ram truck on September 27, 2010 (Veh. Code, § 10851, subd. (a)); and count 5, the second degree robbery of Michael Murillo on September 25, 2010 (§ 211).[4] Except as to counts 2 and 4, it was further alleged Cervantes had committed all of the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)); that Cervantes personally used a firearm during the commission of count 2 (§ 12022.53, subd. (b)) and count 6 (§§ 12022.53, subd. (b), 12022.5, subds. (a) & (d)) and that a principal personally used a firearm in the commission of counts 2 and 5 through 8 (§ 12022.53, subds. (b) & (e)(1)).

At trial, the People presented evidence of the facts summarized above. Murillo's two 9-1-1 calls were played for the jury.

Los Angeles Police Department Officer Juan Aguilar, assigned to the gang enforcement detail in Northeast division, testified regarding his investigation of the crimes involving Bugarin, Hall and Murillo, Gomez and Cazares.

On October 4, 2010, about a week after the crimes involving Murillo, Officer Aguilar testified he went to Murillo's workplace with a six-pack photographic lineup and asked Murillo whether he saw one of the men who had pointed a gun at him and his friends in the lineup. Murillo grabbed it, pointed to Cervantes's picture and said, "That's him, that's Buster." When Officer Aguilar asked Murillo to circle the photograph of the man he had identified, Murillo said, "I don't want to go to court. If I circle, do I have to go to court?" When Officer Aguilar responded, "Yes[,] you're identifying the guy that

---

[4]     Cervantes was also charged with exhibiting a deadly weapon to a peace officer to resist arrest (count 3, § 417.8); and assault with a firearm on a peace officer (count 6, § 245, subd. (d)(1)), relating to events before he was taken into custody on November 7, 2010; in addition, he was charged with the September 24, 2010 robbery (count 7, § 211) and carjacking (count 8, § 215, subd. (a)) of Cesar Bugarin. However, at trial, the jury found Cervantes not guilty of counts 3, 7 and 8, and the trial court dismissed count 6 in the interest of justice (§ 1385).

robbed you[,]" Murillo said, "I don't want to go to court. I don't want to circle it. That's him. If I go to court, I might see his brother and that's not going to be good." Murillo said he was afraid for his safety and the safety of his family.

Then, on October 12, 2010, Officer Aguilar testified, he showed Gomez (Murillo's friend) a six-pack photographic lineup at Gomez's home. Gomez told Officer Aguilar, "Well[,] I know it's not five of those guys . . . . [W]ell[,] it looks like this guy, but . . . it's not him, it's not him." Officer Aguilar told Gomez to "just write what you just [said]." Gomez circled Cervantes's picture and wrote "looks like him, but it's not him."[5]

Officer Aguilar was unable to interview Cazares because Cazares had provided contact information that was not up to date. (According to Cazares's testimony, at the time of the initial investigation, he had given the police the information on his identification, but he had already moved from that address at the time of the events at Murillo's house.)

Officer Aguilar testified he had known Cervantes for five or six years and had interacted with him about 20 times. Cervantes had told Aguilar he (Cervantes) was an Avenues gang member. In 2007, Cervantes used the gang moniker "Buster." In 2010, he used the moniker "Knuckles." According to Officer Aguilar, gang members often changed their monikers. He also testified that in his 8- to 10-years' experience working with Avenues gang members, Cervantes was the only "Buster" he knew, and Cervantes remained an active Avenues gang member.

Based on a hypothetical tracking the evidence presented to the jury, Officer Aguilar opined the attempted robbery, robberies, carjackings and joyriding were committed for the benefit of, in association with or at the direction of the Avenues gang with the specific intent to promote, further and assist in the gang activity of the gang's members. He testified Avenues gang members would often steal cars in order to commit

---

[5] At trial, Gomez testified he did not circle Cervantes's picture; Officer Aguilar did.

other crimes without being detected and commit robberies so the gang is more feared in the community, enabling them to commit further crimes without being reported. According to Officer Aguilar's testimony, victims and witnesses of such crimes "will not come forward and if they do come forward, they're not going to come forward a hundred percent . . . [because] at some point the intimidation factor takes [e]ffect . . . the fear of them being victims of another crime [--] being shot and killed."

Cervantes testified in his own defense. According to Cervantes's testimony, he was "courted in" to the Avenues gang when he was 16 because his brother Carlos (in prison at the time of trial) was a member. His gang moniker was "Knuckles" but he had the moniker "Buster" "before[.]" Cervantes acknowledged he had reported the name "Buster" as his moniker to Officer Aguilar; he said his family had given him the name "Buster"—"in Spanish it will be [']Travieso['], like trouble making."

Cervantes testified he had gotten all of his gang tattoos at once, when he was 17, because he "wanted to be cool" but regretted them now. He said his life had changed in late 2009 when he had a baby girl so he was no longer active in the gang at the time of the 2010 crimes with which he was charged. He said he got shot in 2009 when he told his friends he "didn't want to be from the gang no more." According to Cervantes, he was told "there's no way you're going to get out" but he could be "active" "back stage" "by selling drugs." Although Cervantes had testified he was no longer active in the gang and denied involvement in any crimes after 2009, he acknowledged on cross-examination he was convicted of entering someone else's pickup truck with "one of [his] homeys" and trying to take that vehicle on May 19, 2010—four months before the crime involving Bugarin and his truck.

Cervantes denied involvement in the carjacking involving Bugarin; he said he was at his sister's birthday party at the time. He said one of his friends brought the truck to him a few days later, saying someone had left the keys in it, and others had driven the truck too. Cervantes admitted he had taken pictures in the truck and knew it was stolen.

7

He denied involvement in the attempted robbery of Hall as well as the carjacking and robbery of Murillo.

Cervantes's mother Erika Lopez also testified in his defense. She said Cervantes was at his sister's birthday party on September 18, 2010. (Cesar Bugarin's truck and property were taken at about 3:20 a.m. on September 19, 2010.) Lopez testified Cervantes spent the night in his room at her house that night and never left. Asked whether she would be aware if he left, she testified: "Of course. He's my son, I would have to be behind him. . . . It's a mother's nature to know when your son is not around you, you got to be looking for them." Although Cervantes's sister (and Lopez's daughter) turned four on August 24, Lopez testified Cervantes's daughter was her first granddaughter, and Cervantes had asked Lopez to let her first granddaughter (Cervantes's daughter) have her party before Lopez's daughter's fourth birthday party. "[H]e's my son so I gave it to him." She showed the jury undated photos of Cervantes at a party.

Cervantes's mother confirmed "[Cervantes] is a gang member."

The jury found Cervantes guilty as charged in counts 1 (attempted robbery of Hall), 2 (carjacking of Murillo), 4 (unlawful driving or taking of Bugarin's truck) and 5 (robbery of Murillo).[6]

The trial court sentenced Cervantes to state prison as follows: on count 2 (carjacking (involving Murillo); § 215, subd. (a)), a term of 15 years to life, plus 10 years for personal firearm use (§ 12022.53, subd. (b)); count 1 (attempted robbery (Hall); §§ 664 & 211), a concurrent term of 12 years, comprised of the 2-year midterm for attempted robbery plus 10 years for the related gang finding; count 4 (unlawful driving or taking of Bugarin's truck; Veh. Code, § 10851), a concurrent 2-year midterm; and count 5 (robbery (of Murillo); § 211), a 23-year term comprised of the 3-year midterm for

---

[6] The jury found Cervantes not guilty of count 3 (exhibiting a deadly weapon to a peace officer to resist arrest), 7 (robbery of Bugarin) and 8 (carjacking of Bugarin). At the People's request, the trial court had previously dismissed count 6 in the interest of justice (§ 1385).

robbery plus 10 years each for the related gang (§ 186.22, subd. (b)(1)(C)) and firearm (§ 12022.53, subd. (b)) findings, stayed pursuant to section 654.

Cervantes appeals.

## DISCUSSION

**Substantial Evidence Supports Cervantes's Convictions for the Carjacking and Robbery of Michael Murillo.**

According to Cervantes, "No reasonable trier of fact could have found [him] guilty beyond a reasonable doubt for the crimes committed against Mr. Murillo." We disagree.

First, as Cervantes acknowledges, in considering his challenge to the sufficiency of the evidence on appeal, "'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Jones* (2013) 57 Cal.4th 899, 960, quoting *People v. Abilez* (2007) 41 Cal.4th 472, 504, further citations omitted.)

Further, "'[t]he standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]" [Citation.] "'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.'"' [Citation.]" (*People v. Jones, supra,* 57 Cal.4th at pp. 960-961, quoting *People v. Abilez, supra,* 41 Cal.4th at p. 504.)

Reversal is not warranted "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

A carjacking conviction "requires proof that (1) the defendant took a vehicle that was not his or hers (2) from the immediate presence of a person who possessed the vehicle or was a passenger in the vehicle (3) against that person's will (4) by using force or fear and (5) with the intent of temporarily or permanently depriving the person of possession of the vehicle." (*People v. Magallanes* (2009) 173 Cal.App.4th 529, 534, citing § 215, subd. (a); *People v. Hill* (2000) 23 Cal.4th 853, 858–859.)

Citing *People v. Coleman* (2007) 146 Cal.App.4th 1363, 1365, but conceding that it is not on point (as he says the carjacking conviction was reversed in that case because "there was insufficient evidence to support actual or construction possession"), Cervantes contends "this Court should do the same because there was not a proper identification, or any other evidence to convict [him]." This is so, he says, because Murillo, Gomez and Cazares "all stated that it was *not* [Cervantes] who robbed and carjacked them."

The record defeats Cervantes's argument. Murillo identified Cervantes on the day of the crimes against him. Both Murillo and Gomez spoke on the calls to 9-1-1 on September 25, 2010. When Murillo spoke with Officer Rivas about 40 minutes after calling 9-1-1 to report what had occurred that day (September 25, 2010), he said he recognized one of the two Hispanic males with guns as "Buster from Avenues, Carlos's brother." Then, on October 4, 2010, Murillo pointed out Cervantes's photograph in a six-pack lineup, telling Officer Aguilar, "[T]hat's him, that's Buster." However, as the jury also heard, Murillo refused to fill out the form regarding his identification, expressing his fear that if he had to go to court, he might "see [Cervantes's] brother and that's not going to be good." Although he repeatedly stated he did not want to go to court, Murillo also unequivocally stated, "That's him[,]" referring to Cervantes's photograph. Officer Aguilar also testified that Murillo had told him that people had come to his house, and he (Murillo) was afraid they would be back to "get" him or his family.

When Gomez first viewed the six-pack lineup, he expressed his certainty that the other five men were *not* involved, then indicated the photograph of Cervantes "looks like him, but it's not him." In addition, Gomez had testified his brother was a Highland Park

10

gang member—the Avenues gang's rival and had expressed his fear of testifying and being considered a "snitch" as "snitches . . . get green lighted"—"like they're going to come and kill you."

The jury also heard that although Murillo and Gomez had been subpoenaed to appear, they both failed to return for the afternoon session of Cervantes's preliminary hearing, telling Officer Aguilar they were "afraid," it was "not worth it," and they had already "d[one their] job" and were "done." Cazares provided the police with contact information he knew was no longer up to date and when he was located and called upon to testify, he volunteered that he did not remember anything before the prosecutor even asked her first question.

In *People v. Cuevas* (1995) 12 Cal.4th 252, our Supreme Court observed "many varied circumstances . . . may attend an out-of-court identification and affect its probative value. These circumstances include, for example: (1) the identifying witness's prior familiarity with the defendant; (2) the witness's opportunity to observe the perpetrator during the commission of the crime; (3) whether the witness has a motive to falsely implicate the defendant; and (4) the level of detail given by the witness in the out-of-court identification and any accompanying description of the crime." (*Id.* at p. 267, citation omitted.) The jury received CALCRIM No. 315 so they received express instructions regarding the factors to be considered in evaluating eyewitness testimony, including whether, for example, the eyewitness knew or had contact with the defendant before the crimes occurred. "Evidence of these circumstances can bolster the probative value of the out-of-court identification by corroborating both that the witness actually made the out-of-court identification (e.g., testimony by the police officer or other person to whom the statement was made) and that the identification was reliable (e.g., evidence that the witness was present at the scene of the crime and in a position to observe the perpetrator, evidence that the witness had a prior familiarity with the defendant, or evidence that the witness had no self-serving motive to implicate the defendant)." (*People v. Cuevas, supra,* 12 Cal.4th at p. 267.)

11

Cervantes's argument that Murillo's, Gomez's and Cazares's "clear non-identification" at trial compels reversal ignores our obligation to review the record as a whole. The jury heard testimony that Cervantes was not a stranger to Murillo at the time of the carjacking and robbery; Murillo already knew him as "Buster" and Carlos's brother and was certain of his identification at the time of the crimes because he immediately recognized Cervantes based on this prior knowledge. Although Murillo attempted at trial to deny and distance himself from his prior identification(s) of Cervantes (*People v. Jackson* (2005) 129 Cal.App.4th 129, 167 ["[j]urors are the sole judges of a witness's credibility and they are rightfully suspicious of trial testimony that deviates 180 degrees from what the witness told the police . . . ."]), the jury heard testimony regarding the fear Murillo, Gomez and Cazares all exhibited in coming to court to testify against Cervantes. The carjacking and robbery took place in front of Murillo's home, one of the gunmen said he knew a Highland Park member lived there, Gomez's brother was a Highland Park member and all three victims knew Cervantes's gang (Avenues) as a Highland Park rival in the neighborhood. The jury had the opportunity to assess Murillo's as well as the other witnesses' demeanor. Although Murillo, Gomez and Cazares all tried to claim at trial they could not identify Cervantes, the jury heard both police officers' testimony which gave context to this apparently contradictory testimony. Their efforts *not* to identify Cervantes when it came time to testify at trial cannot be viewed in isolation, and it was up to the jury to determine the truth notwithstanding the conflicts between the prior identifications and trial testimony. "It is the exclusive province of the trier of fact to determine credibility and the truth or falsity of the facts upon which credibility depends." (*People v. Allen* (1985) 165 Cal.App.3d 616, 623.)

On this record, the jury could reasonably conclude that Murillo knew Cervantes to be one of the gunmen involved in the carjacking and robbery—as evidenced by his unequivocal identifications initially provided to the police on more than one occasion—and Gomez did not hesitate to eliminate the five other photographs in the six-pack lineup he was shown and acknowledged that one of the gunmen looked like the photograph of

12

Cervantes, but when it was time to testify against Cervantes at trial, Murillo (as well as his friends Gomez and Cazares) were too afraid to identify Cervantes in court.[7] "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Lindbergh* (2008) 45 Cal.4th 1, 27.) It follows that substantial evidence supports Cervantes's carjacking and robbery convictions relating to Murillo and his Honda Accord. (*People v. Bolin, supra,* 18 Cal.4th at p. 331 [reversal is unwarranted "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]'"]; *People v. Allen, supra,* 165 Cal.App.3d at p. 623 ["Weaknesses and inconsistencies in eyewitness testimony are matters solely for the jury to evaluate" and, as long as the identification is not "inherently improbable or factually impossible under the circumstances shown," the "testimony of a single eyewitness is sufficient to support a criminal conviction"].)

**Cervantes Forfeited His Claim of Error in the Admission of Testimony Regarding Gomez's Original Response When He Viewed the Photographic Lineup.**

Cervantes also contends Officer Aguilar coerced Gomez's initial statement about the six-pack photographic lineup he was shown shortly after the crimes.[8] We agree with the Attorney General that Cervantes forfeited this claim by failing to raise such an objection in the trial court. Cervantes says he did so, but we have reviewed the transcript, and he is incorrect. In the cited passage, the prosecutor had shown Gomez the six-pack lineup. During questioning, Gomez acknowledged that he had written the statement "looks like him . . . but it's not him" in his own handwriting and agreed it was his signature written below the statement he wrote when he was originally asked whether he

---

[7] According to the record, at least one of the witnesses was visibly "shaking" while testifying against Cervantes at trial.

[8] He also says his "due process rights were violated and the witness*es* relating to the Murillo incident should have been excluded from testifying at all." (Italics added.) Because he has failed to provide legal argument or citations to the record in support of any claim of coercion involving any witness testimony other than Gomez's, we limit our discussion to the challenged testimony from Gomez.

recognized anyone involved in the incident at Murillo's house. At trial, however, Gomez testified he had not circled Cervantes's photo; he said Officer Aguilar had. Gomez testified he had not recognized anyone in the lineup, and he had only written the statement because Officer Aguilar told him to do so. The prosecutor then said: "Okay. So now you've never seen this guy before, but it kind of looks like him. Does that make sense, Mr. Gomez, you never seen it [sic, him] before, but he kinda looks like him. Which one is it?" Defense counsel objected to the prosecutor's question challenging Gomez's apparently inconsistent testimony: "Badgering the witness." Contrary to his representation, Cervantes did not object to the admission of Gomez's original statement regarding the photographic lineup on the ground Officer Aguilar had obtained this prior statement from Gomez through coercion. "A claim of coercion is not cognizable on appeal in the absence of an objection to the testimony at trial." (*People v. Kennedy* (2005) 36 Cal.4th 595, 612, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

## *DISPOSITION*

The judgment is affirmed.


**WOODS, J.**


**We concur:**



**PERLUSS, P. J.**                    **ZELON, J.**


14