Filed 12/24/14  P. v. Sloan CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C072400 |
| v. | (Super. Ct. No. CRF121703) |
| VINCENT TROY SLOAN, | |
| Defendant and Appellant. | |

A jury convicted defendant Vincent Troy Sloan of second degree robbery and misdemeanor hit and run.  He now contends (1) there is insufficient evidence to support the robbery conviction, and (2) the trial court erred in failing to stay the sentence on his hit and run conviction pursuant to Penal Code section 654.

We conclude there is substantial evidence from which a reasonable jury could find defendant guilty of robbery beyond a reasonable doubt, and the trial court did not commit

1

sentencing error because there is substantial evidence defendant entertained separate criminal objectives in committing the robbery and in leaving the scene of the accident.

We will affirm the judgment.

BACKGROUND

M.M. arrived home at about 7:50 p.m., after she deposited checks at a Wells Fargo Bank automated teller machine (ATM). As she stood at her front door with a bank bag labeled Wells Fargo, she noticed a man approaching her. The bank bag contained her personal checkbook, an ATM card, and the receipts from the deposit she made that night. The man grabbed M.M. from behind and ordered her to give him the bank bag. M.M. screamed and kicked her front door. The man hit her, took the bank bag, and ran to a car.

The robber's face was covered and M.M. could not identify him. But she said he was a very tall, thin, Black man with short hair.

M.M.'s husband (husband) came out of the house when he heard his wife shouting for help. He saw a tall, thin, Black man with short hair running away. Husband only saw the back of the man's head. He said the man was a little taller than six feet two inches. The man got into the passenger's side of a car.

Police were dispatched at 7:55 p.m. in response to a call about the robbery.

Husband followed the robber's car in his truck. At one point, his truck was right behind the car. Husband saw the car run a red light and enter the freeway. Husband waited for the traffic light to change and drove onto the freeway. He saw the robber's car at the scene of an accident sometime before 7:59 p.m. Husband did not see the occupants of the car at the scene of the accident.

Ricardo B. was driving onto the freeway when a car going in the wrong direction and at a high rate of speed slid down the freeway onramp. David C. was driving behind Ricardo's car when he saw headlights, indicating that a vehicle was going the wrong way on the freeway onramp. The rear of the approaching vehicle lifted up and the vehicle

2

rolled in front of Ricardo's car. The vehicle then collided with the right side of Ricardo's car and slid down the embankment.

Ricardo injured his arm. The front passenger airbag deployed and hit his wife in the face. Ricardo's teenaged daughter Natalie suffered a slight concussion. The front passenger door of Ricardo's car was jammed.

The car that collided with Ricardo's car slid into a ditch. The passenger side of that car suffered major damage. The passenger side window was shattered and there was a spider web-type crack in the windshield, in front of the front passenger seat. The car, a Kia sedan, was registered to defendant and his wife. It was not reported stolen. Damian M., a person who lived with defendant and defendant's family, had permission to drive the Kia, but Damian dropped the Kia off at defendant's house the day before the robbery and he did not see it again.

David saw two men "aggressively exiting" the driver's side window of the Kia. The driver exited first. He was not bleeding. The passenger got out of the car and, using a tree, went over a sound wall to an apartment complex on the other side of the wall. The driver followed. About five to seven seconds elapsed between the time the men crawled out the car window and when they climbed over the sound wall. The men left before police arrived on scene.

Natalie saw two Black individuals get out of the Kia, but she did not see their faces. According to David, the men were African-American, between 18 and 22 years old, thin, and five foot ten to six feet tall. The men weighed 160 to 180 pounds. David saw the passenger of the Kia only briefly. The passenger was lighter skinned and had short hair. The driver was darker skinned and had dread locks. One of the men wore a white shirt. David and Natalie could not identify anyone they saw during a photographic lineup.

Three teenagers, A.M., S.G. and E.F., lived at the apartment complex on the other side of the sound wall. The boys were playing basketball when they saw a man walk past

3

them and head out of the apartment complex.  They saw the man a couple of minutes before the police arrived.

One of the boys asked his friends, "[D]on't that guy look familiar[?]"  Someone responded the man used to live at the apartment complex.  Defendant and his family lived at the apartments from June 2011 to February 2012.  According to E.F., S.G. said the man was "Vincent Sloan or Vincent."  E.F. was standing close enough to recognize the man.  He agreed with S.G. the man looked like defendant.  E.F. knew defendant as a person who used to live at the apartments.  He knew defendant's name and the names of defendant's children.

Woodland Police Officer Gina Bell arrived at the apartments at 8:06 p.m.  She first spoke with the teenagers at about 8:14 p.m.  The boys told Officer Bell a man with a bloody face walked by them.  One of the boys later told Officer Bell the man was defendant.  He gave the officer defendant's first and last name.  A.M. said defendant lived near S.G. but had moved out weeks before.  A.M. reported defendant wore a white shirt, and his face was dripping with blood.  According to A.M., the boys asked if defendant was okay, and defendant answered he fell jumping over a fence.

Within hours after seeing defendant, E.F. and A.M. identified defendant in a photographic lineup as the man they had seen.  At a subsequent photographic lineup, S.G. identified defendant as the man he had seen.

Woodland Police Department Detective Richard Towle spoke with defendant's wife Patresa Sloan two days after the robbery.  Defendant and his family suddenly left town after the detective told Patresa he needed to speak with defendant.

Detective Towle interviewed defendant two-and-a-half weeks after the robbery.  Defendant had a cut to the upper right side of his forehead.  He could not be excluded as a contributor of a DNA sample obtained from the passenger side windshield of the Kia.  One in a million African-Americans, one in 600,000 Caucasians, and one in 1.2 million Hispanics would also possibly match the DNA sample obtained from the Kia.

4

At trial, E.F. again identified defendant as the person he saw the night the boys played basketball. But S.G. and A.M. retracted their identifications.

S.G. admitted telling the detective who showed him a photographic lineup that the person he picked at the lineup was named Vincent Sloan, and S.G. knew defendant and defendant's children because they lived at the apartment complex. However, S.G. testified the information he had about the man he saw came from E.F. and A.M. S.G. said his friends told him the man was bleeding, they asked the man what happened to him, and the man answered he fell when he went over a fence. S.G. denied that he recognized the man, although he said the man resembled the father of some kids who lived at the apartment complex. S.G. said he picked out defendant because his friends told him they picked defendant and his friends were sure defendant was the man they saw. S.G. said he was not sure whether defendant was the person he saw.

A.M. denied seeing anyone he knew or anyone who was injured walk by on the night he played basketball. He denied that he had ever seen defendant before. He also denied that he knew someone called Vincent Sloan. A.M. denied telling police he knew the identity of a person who walked by him. A.M. said he picked out someone at the photographic lineup because that person "looked familiar." He said he did not know what suspect he was supposed to identify and he was sleepy when he made the photographic lineup identification.

Patresa testified at the trial as follows: Patresa last saw the Kia at about 3:45 p.m. or 4:00 p.m. on the day of the robbery, when it was parked on her driveway and she saw Damian walking up to the house. Patresa took her son to the grocery store. The Kia was gone when she returned home. She believed Damian borrowed the car. Defendant hit his head in the basement of their home and was bleeding on his forehead when he came up from the basement to eat dinner that night. Defendant remained home the entire evening. The next day, Patresa realized Damian did not have the Kia after she questioned him

5

about the car.[1]  She went to the West Sacramento police station that day to make a report and learned the Kia was being held as evidence.  Two days after the robbery, Detective Towle questioned her about defendant's whereabouts.  She told the detective defendant was at home and gave the detective their home address.  She and defendant took their children out of school that day or the next and went to Stockton for at least a week to help move defendant's parents.

The Yolo County dispatch center would have a record of any report that the Kia had been stolen.  No such record existed.

The jury found defendant guilty of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c)).[2]  It acquitted defendant of driving a vehicle and becoming involved in an accident resulting in injury to another person and failing to immediately stop at the scene of the accident and to fulfill the requirements of Vehicle Code section 20003 (Veh. Code, § 20001), but convicted him of the lesser included offense of driving a vehicle and becoming involved in an accident resulting in damage to property and failing to fulfill the requirements of Vehicle Code section 20002 (hereafter hit and run).

The trial court sentenced defendant to an aggregate term of six years, including the upper term of five years in prison on the robbery count and a six-month jail sentence on the hit-and-run count to run concurrent with the prison term.

DISCUSSION

I

Defendant contends there is insufficient evidence to support the robbery conviction.

---

[1]  Damian testified Patresa never asked him where the Kia was.

[2]  Undesignated statutory references are to the Penal Code.

6

We assess the sufficiency of the evidence, including an out-of-court identification, to support a conviction under the substantial evidence test. (*People v. Cuevas* (1995) 12 Cal.4th 252, 257, 272.) The standard is the same under the state and federal due process clauses. (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) We review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Cuevas, supra,* 12 Cal.4th at p. 260.) Substantial evidence is evidence which is reasonable, credible, and of solid value. (*Ibid.*) Evidence which merely raises a strong suspicion of the defendant's guilt is insufficient to support a conviction. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

In reviewing the record, we presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) And we resolve all conflicts in the evidence and all questions of credibility in favor of the verdict. (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.) We will reverse a judgment for insufficient evidence only if it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the verdict. (*People v. Zamudio* (2008) 43 Cal.4th 327, 358.)

Defendant says the descriptions of the robber did not match defendant's appearance. We conclude, however, that there was substantial evidence of defendant's identity as the robber.

Husband saw the robber get into a car, and he followed that car. The car husband followed was registered to defendant and his wife. There was no record the car was reported stolen. The key was in the ignition and defendant's wallet, with cash still intact, was found in the passenger area of the car. Defendant's cell phone was also in the car. The last call made from the cell phone was to a person on defendant's contact list on the day of the robbery.

Witnesses saw two Black men get out of defendant's car after it collided with Ricardo's car. The men jumped over a sound wall and went to the apartment complex located behind the sound wall. Three teenagers saw a man they later identified as defendant walk by them minutes before police officers arrived at the apartment complex. One of the teens told Officer Bell defendant's face was dripping with blood. Defendant could not be excluded as a contributor of the DNA obtained from a fresh smear found in the area of the cracked windshield of defendant's car. Detective Towle said if a person sitting in the car leaned forward they could hit their head where the windshield had cracked, and defendant had a cut on his forehead where a person's head could have hit the windshield while sitting in the car.

The boys identified defendant, in a photographic lineup, as the person they saw. (*People v. Boyer* (2006) 38 Cal.4th 412, 480 [" 'an out-of-court identification generally has *greater* probative value than an in-court identification, even when the identifying witness does not confirm the out-of-court identification' "].) E.F. again identified defendant at trial as the person he saw. The testimony of a single eyewitness, if not inherently incredible, is sufficient to support a verdict. (Evid. Code, § 411; *People v. Boyer, supra,* 38 Cal.4th at p. 480; *People v. Keltie* (1983) 148 Cal.App.3d 773, 782.) In addition, there is evidence defendant left town suddenly after Detective Towle told Patresa the detective needed to speak with defendant, suggesting a consciousness of guilt.

Defendant argues the identifications by the three teenaged boys were vague and contradictory. But the strength of eyewitness identification testimony and discrepancies in the testimony are matters to be evaluated by the jury. (*People v. Ford* (1981) 30 Cal.3d 209, 215; *People v. Mendez* (2010) 188 Cal.App.4th 47, 59; *In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497; *People v. Taylor* (1955) 136 Cal.App.2d 118, 123.)

Based on our review of the entire record and applying the substantial evidence standard, we conclude there is substantial evidence from which a reasonable jury could find defendant guilty of the robbery beyond a reasonable doubt.

8

This case is clearly distinguishable from *People v. Briggs* (1967) 255 Cal.App.2d 497, a case defendant cites. In *Briggs,* the only evidence connecting the defendant to the crime was a wallet the defendant had reported lost, which was later found at the crime scene. (*Id.* at pp. 498-499.) As we have explained, the entire record here does more than raise a mere suspicion that defendant committed the charged robbery.

## II

Defendant further claims the trial court erred in failing to stay the sentence on his hit-and-run conviction pursuant to section 654. He says the hit and run was a continuation of his escape following the robbery.

Section 654 provides that an act or omission punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. (§ 654, subd. (a).) The phrase "act or omission" in section 654 refers not only to a single act or omission which results in multiple convictions but also to a course of conduct which violates more than one statute but nevertheless constitutes an indivisible transaction. (*People v. Beamon* (1973) 8 Cal.3d 625, 636-637 (*Beamon*).) Whether a course of criminal conduct is divisible and, therefore, gives rise to more than one act or omission within the meaning of section 654 depends on the intent and objective of the defendant, not the temporal proximity of the charged offenses. (*People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*); *Beamon, supra,* 8 Cal.3d at p. 637.) If all the offenses are incident to one objective or are the means of accomplishing or facilitating one objective, the defendant may be punished for any one of those offenses but not for more than one. (*Harrison, supra*, 48 Cal.3d at p. 335; *Beamon, supra,* 8 Cal.3d at p. 637.) If, on the other hand, the defendant "entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in

9

pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*Beamon, supra,* 8 Cal.3d at p. 639.)

The question whether the defendant entertained multiple criminal objectives is one of fact for the trial court, and its findings on the question will not be reversed on appeal unless unsupported by substantial evidence. (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135-1136; *People v. Butler* (1986) 184 Cal.App.3d 469, 473 (*Butler*).) We review the trial court's determination in the light most favorable to the judgment and presume the existence of every fact the trial court could reasonably deduce from the evidence. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

*Butler, supra,* 184 Cal.App.3d 469, is instructive. In that case a jury convicted the defendant of vehicular manslaughter and felony hit and run. (*Id.* at pp. 470-471.) The conviction arose from a fatal accident the defendant caused while driving under the influence of alcohol. (*Id.* at p. 474.) The defendant fled when his vehicle collided with the victim's pickup truck. (*Id.* at p. 471.) The defendant argued the imposition of consecutive sentences for vehicular manslaughter and felony hit and run violated section 654. (*Id.* at p. 471.) He said " '[t]he post homicidal act of flight [was] inextricably bound into the indivisible act of [the] operation of that motor vehicle.' " (*Id.* at p. 473.) He pointed out the vehicular manslaughter and the hit and run occurred within a time span of less than three minutes. (*Ibid.*)

The appellate court found two separate states of mind evident. (*Butler, supra,* 184 Cal.App.3d at p. 473.) "In the act of vehicular manslaughter [the] defendant was acting with general intent; he negligently drove a motor vehicle while under the influence of alcohol and caused a fatal accident. Defendant then violated Vehicle Code section 20001 by intentionally leaving the scene of the accident instead of remaining and rendering aid as required by law. This was an independent and separate criminal act. Defendant's intent and objective, when he left the car initially, returned to get his keys, and again left the scene, was to flee in an attempt to conceal his identity and his state of

10

inebriation." (*Butler, supra*, 184 Cal.App.3d at p. 474.) Therefore, the appellate court held section 654 did not bar the imposition of consecutive sentences for vehicular manslaughter and felony hit and run. (*Butler, supra*, 184 Cal.App.3d at p. 474.)

Here, the trial court explained the imposition of a concurrent sentence on count 2, but it did not discuss the applicability of section 654 and the parties did not raise the issue.[3] In any event, there is substantial evidence defendant entertained separate criminal objectives in robbing M.M. and in subsequently willfully leaving the scene of the accident. In committing robbery, defendant intended to permanently deprive M.M. of her property. By intentionally leaving the scene of the accident without performing the duties required by law, defendant acted with a criminal objective independent of his intent to deprive M.M. of her property.

Defendant likens this case to *People v. Guzman* (1996) 45 Cal.App.4th 1023, but *Guzman* is distinguishable. The defendant in *Guzman* was convicted of first degree burglary and grand theft of personal property. (*Id.* at p. 1025.) The requisite intent for the burglary and the theft under the circumstances of that case was the same: to steal a motorcycle. (*Id.* at pp. 1025-1026, 1028.) Here, defendant had an independent criminal objective when he intentionally left the scene of the accident without performing his legal duty.

Citing cases discussing the felony-murder rule, defendant also contends the robbery and the hit and run were part of an indivisible course of conduct within the meaning of section 654. However, the felony-murder rule has no application here as no one was killed. And the test for determining whether a robbery is ongoing for purposes

_____

[3] The trial court said concurrent sentencing was appropriate because the robbery and the hit and run were part of the same course of conduct. That finding does not bar multiple punishment under section 654 because a defendant could harbor separate criminal objectives, which are independent of and not merely incidental to each other, even though he engaged in an indivisible course of conduct. (*Beamon, supra,* 8 Cal.3d at p. 639.)

of the felony-murder rule, which imputes malice aforethought to the felon who kills in the perpetration of an inherently dangerous felony (*People v. Smithson* (2000) 79 Cal.App.4th 480, 502), is distinguishable from the test for section 654, which examines whether the defendant entertained multiple criminal objectives. (*People v. Wilson* (2008) 43 Cal.4th 1, 17, fn. 6 [the " 'separate acts' " inquiry under section 654 is not central to the felony-murder rule]; *People v. Perry* (2007) 154 Cal.App.4th 1521, 1527 [whether an offense might be deemed ongoing for the felony-murder rule is irrelevant to a section 654 analysis]; *People v. Nguyen* (1988) 204 Cal.App.3d 181, 193, criticized on another point in *People v. Berry* (1993) 17 Cal.App.4th 332, 339.)

Punishing defendant for failing to fulfill his statutory duties in the event of a damage-causing accident effectuates the purpose of section 654 to ensure that defendant is punished commensurate with his culpability. (*Harrison, supra*, 48 Cal.3d at p. 335.) Such punishment also meets the purpose of Vehicle Code section 20002 to deter the driver of a vehicle involved in an accident from fleeing and concealing his identity to escape responsibility. (*Miglierini v. Havemann* (1966) 240 Cal.App.2d 570, 573.) As the appellate court reasoned in *Butler, "*If multiple punishment is prohibited in this case, as a matter of law, there would be no incentive for a person who causes an accident to stop . . . . In fact, noncompliance would be rewarded. A defendant would suffer no greater criminal liability if he took his chances on escaping than if he stopped and rendered aid. Our Legislature could not and did not intend such an absurd result." (*Butler, supra,* 184 Cal.App.3d at p. 474.)

The trial court did not err in imposing concurrent sentences for the robbery and the hit and run.

DISPOSITION

The judgment is affirmed.

           MAURO        , J.

We concur:

       BLEASE      , Acting P. J.

       ROBIE      , J.